707 A.2d 977

ALICE I. MAVRIKIDIS AND KONSTANTINOS MAVRIKIDIS, HER HUSBAND, PLAINTIFFS–APPELLANTS AND CROSS–RE-SPONDENTS, v. GERALD PETULLO, PETULLO BROS., INC., ITS AGENTS, SERVANTS AND/OR EMPLOYEES, ANGELO PE-TULLO, GERALDINE PETULLO, OTTAVIO PETULLO AND/OR GERALD PETULLO, TRADING AS PETULLO BROS., INC., AN

ALLEGED CORPORATION AND CLAR PINE SERVICENTER, ITS AGENTS, SERVANTS AND/OR EMPLOYEES, DEFENDANTS–RESPONDENTS AND CROSS–RESPONDENTS, AND NEWARK ASPHALT CORP., ITS AGENTS, SERVANTS AND/OR EMPLOYEES, DEFENDANT–RESPONDENT AND CROSS–APPELLANT, AND "ABC" (A FICTITIOUS NAME), DEFENDANT.

MOTOR CLUB OF AMERICA INSURANCE COMPANY AS SUBROGEE OF KONSTANTINOS MAVRIKIDIS AND MOTOR CLUB OF AMERICA INSURANCE COMPANY, PLAINTIFFS–APPELLANTS AND CROSS–RESPONDENTS, v. PETULLO BROTHERS, INC., GERALD PETULLO A/K/A JERRY PETULLO AND ANGELO PETULLO, GERALDINE PETULLO, OTTAVIO PETULLO AND/OR GERALD PETULLO T/A PETULLO BROTHERS, INC., AN ALLEGED CORPORATION AND CLAR PINE SERVICENTER, DEFENDANTS–RESPONDENTS AND CROSS–RESPONDENTS, AND NEWARK ASPHALT CORP., DEFENDANT–RESPONDENT AND CROSS–APPELLANT, AND JOHN DOES 1 THROUGH 10 AND ABC, DEF AND GHI CORPORATIONS (FICTITIOUS NAMES), DEFENDANTS.

Argued October 7, 1997—Decided March 11, 1998.

122

*David B. Glazer,* argued the cause for appellants and cross-respondents (*Glazer & Luciano,* attorneys; *Mr. Glazer* and *Michael A. Luciano,* of counsel and on the briefs).

*Paul A. Spina,* argued the cause for respondent and cross-appellant (*Paul Seligman,* attorney; *Mr. Spina* and *Manuel J. Almedia, Jr.,* on the brief).

*William T. Connell,* argued the cause for respondent and cross-respondent Clar Pine Servicenter (*Dwyer, Connell and Lisbona,* attorneys).

*William J. Ewing,* submitted a brief on behalf of respondents and cross-respondents Gerald Petullo, Petullo Bros., Inc., its agents, servants and/or employees, Angelo Petullo, Geraldine Petullo, Ottavio Petullo and/or Gerald Petullo, trading as Petullo Bros., Inc., an alleged corporation.

The opinion of the Court was delivered by

GARIBALDI, J.

In this case, we revisit the parameters of the vicarious liability doctrine as it pertains to whether a contractee may be vicariously liable for the negligence of its independent contractor under the three separate bases of liability delineated in *Majestic Realty Associates, Inc. v. Toti Contracting Co.,* 30 *N.J.* 425, 153 *A.*2d 321 (1959). Furthermore, we consider the additional issue of an employer's direct liability for the negligent hiring of an independent contractor.

I

This case arose from an automobile accident that resulted in severe injury to plaintiff Alice Mavrikidis [1] (Mavrikidis or plaintiff), including second- and third-degree burns over twenty-one percent of her body. On September 11, 1990, the intersection collision occurred after defendant Gerald Petullo,[2] operating a

---

[1] The named plaintiffs in this case, Mavrikidis and her husband, Konstantinos Mavrikidis, filed the complaint against defendants in December 1990. Her husband joined the action *per quod.* Mr. Mavrikidis subsequently passed away, and his Estate was substituted as a plaintiff.

[2] Due to the number of defendants with the surname Petullo, we refer to members of the Petullo family by their given names.

dump truck registered to Petullo Brothers, Inc. (Petullo Brothers), drove through a red light, struck plaintiff's car, hit a telephone pole, and then overturned, spilling the truck's contents onto Mavrikidis's car. At the time of the accident, Gerald was transporting 10.99 tons of hot asphalt, which had been loaded onto the truck by Newark Asphalt Corporation (Newark Asphalt), to his job site at Clar Pine Servicenter (Clar Pine), a retail gasoline and automotive repair shop in Montclair.

Prior to the accident, Clar Pine's owner, Karl Pascarello (Pascarello), decided to renovate the station because he was switching gasoline brands from Getty to Gulf Oil. Those renovations included the installation of new pumps and canopies. Palisades Resources, a distributor for Gulf Oil, retained an architect for Clar Pine and supplied Pascarello with blueprints, new pumps, and canopies for the station. The canopies were installed by Fashion Design, a construction company engaged by Palisades Resources. Pascarello obtained the required approval from the Montclair zoning board. He purchased and assembled a metal frame that was placed around the gasoline pumps, assisted his father in some of the plumbing work, and installed a protective device necessary to make the pump island explosion-proof. He also hired a contractor to do the electrical work.

Because Pascarello had no experience in the construction or paving business, he hired Gerald's father, Angelo Petullo, to perform the asphalt and concrete work as part of the renovation of his service station. Pascarello had known Angelo since 1972 and, prior to hiring him, Pascarello examined other paving jobs that Angelo had completed. Pascarello hired Angelo by verbal agreement to participate in the station's renovations based on Angelo's reputation as an excellent mason and, to a lesser extent, the debt owed Clar Pine under the Petullo Brothers' account. Over the years, Angelo and Gerald had charged gas and small repairs to their company account. In exchange for the asphalt work, both parties orally agreed that the Petullos would receive a $6,800

credit toward a $12,000 to $20,000 debt that Petullo Brothers had accumulated.

At trial, there was conflicting testimony whether Angelo or Gerald operated Petullo Brothers, a corporation that had been dissolved in 1978 by the New Jersey Secretary of State for nonpayment of annual fees. Although Angelo and Gerald both testified that Gerald had been running the company since 1982 and that Angelo formally transferred ownership to his son in 1989, Pascarello testified that he considered Angelo to be the company head and Gerald to be an employee who worked "hand in hand" with his father. Furthermore, a police officer testified that, at the accident site, Angelo identified himself as the owner of Petullo Brothers. The jury concluded that Pascarello hired Angelo and Petullo Brothers to complete the asphalt and concrete work at the Clar Pine job site.

The Petullos supplied the labor, equipment, concrete, and most of the asphalt needed for the job, until Angelo "ran out of money" in the midst of the renovations. As a result, Pascarello provided him with a blank check made out to Newark Asphalt to purchase the asphalt on the day of the accident. Pascarello testified that he supplied Angelo with a check because he "[was] the type of person you don't give cash to." Nevertheless, it is undisputed that Pascarello was not involved in supervising the Petullos' work on a daily basis. Other than general supervision and periodic consultation, Pascarello's limited participation in the asphalt work consisted of payment for three loads of asphalt, including the one involved in this accident, as well as his direction to lay the asphalt in front of the service station's bay doors first to enable him to continue his automotive repairs while the gas station was out of service. As part of its regular course of business, Clar Pine repaired cars and small trucks. During completion of the paving job, Clar Pine remained open for business, servicing cars but not selling gasoline.

On the morning of the accident, Gerald ordered twenty tons of asphalt from Newark Asphalt's plant. The employees of Newark

Asphalt loaded 10.99 tons of asphalt, at a temperature between 300 and 310 degrees Fahrenheit, onto Gerald's truck and 9 tons onto a second truck. The vice-president of the asphalt supplier, Michael Manno, testified that its workers did not physically inspect its customers' vehicles to ensure their ability to carry a given load. Rather, he explained, Newark Asphalt is "like a grocery store." Its employees "are not policemen, we don't inspect anything." If the customer is able to pay, the customer will receive what is ordered.

The employees at Newark Asphalt, however, do conduct visual inspections of a truck to determine whether it can accommodate the requested load. According to Manno's testimony, such a visual inspection of Gerald's truck would lead to the conclusion that it could haul up to fifteen tons of asphalt in its truck bed. Yet, at the scene of the accident, Gerald admitted to the responding police officer that he was unable to stop at the red light because of the load on his truck.

The police also learned at the scene of the accident that Gerald's driver's license had been suspended. The officer issued two summonses to Gerald—one for failure to stop at a red light and the other for driving while on the suspended list. Shortly after the collision, Angelo arrived on the scene to assist in cleaning up the asphalt before it cooled and stuck to the roadway. The officer issued three summonses to Angelo, whose license had also been suspended—one for driving while suspended, one for having no vehicle insurance, and one for allowing an unlicensed driver (Gerald) to operate a vehicle. At trial, the officer explained that he issued the second and third tickets to Angelo because, as noted before, he identified himself as the owner of Petullo Brothers. Although Gerald and Angelo dispute their speaking with the officer at the scene of the accident, it was stipulated at trial that on February 26, 1991, both Petullos pleaded guilty in Bloomfield Municipal Court to driving while on the suspended list on September 11, 1990. At that same municipal hearing, Gerald also pleaded guilty to disregarding a traffic signal and failing to have insurance

on the date of the accident. Furthermore, Petullo Brothers, through Gerald, pleaded guilty to operating an unsafe and overweight vehicle on September 11, 1990.

As a result of an inspection of Gerald's truck, conducted two days after the accident by a member of the commercial vehicle inspection unit of the Essex County Police Department, two weight violations were uncovered: (1) the truck's weight at the time of the accident exceeded the gross vehicle weight (GVW) of 32,000 pounds, for which it was registered with the Division of Motor Vehicles, by 866 pounds [3] and (2) the combined weight of the cargo plus the axle exceeded the statutory limit by 5,106 pounds.[4] The officer who inspected the truck explained that owners can register their trucks for whatever GVW they choose. The GVW is the weight of the vehicle plus its cargo. The officer testified, however, that the truck's GVW of 32,000 pounds was "an inordinately high figure." In his deposition testimony, which was read to the jury at trial, Gerald testified that the GVW of the truck was actually 18,000 pounds. At trial, however, Gerald testified that the GVW of the truck was 27,000 pounds. In addition, the truck's right rear brake was "non-existent" and wooden side boards had been added to the truck to increase its holding capacity. Moreover, the testimony of plaintiff's expert indicated that the cause of the accident was primarily due to the truck being excessively overloaded by eighty-two percent. His

---

[3] *N.J.S.A.* 39:3–20(e) provides in pertinent part:

The owner, lessee, bailee or any one of the aforesaid of a vehicle or combination of vehicles, including load or contents, found or operated on any public road, street or highway or on any public or quasi-public property in this State with a gross weight of that vehicle or combination of vehicles, including load or contents, in excess of the weight limitation permitted by the certificate of registration for the vehicle or combination of vehicles, pursuant to the provisions of this section, shall be assessed a penalty. . . .

[4] *N.J.S.A.* 39:3–84(b)(1) provides in pertinent part:

The gross weight imposed on the highway or other surface by the wheels of any one axle of a vehicle or combination of vehicles, including load or contents, shall not exceed 22,400 pounds.

calculation was based on Gerald's deposition testimony that the actual GVW for the truck was 18,000 pounds. The expert further testified that had the truck not been overloaded, Gerald would have maintained better control and required a shorter braking distance.

Pascarello testified that the Petullos' trucks appeared to be "junks" and would run for three to five days before breaking down. Specifically, Pascarello observed that the trucks had dents in the bumpers and fenders, loosened grills and tailgates, and frequent bald tires. None of those observations, however, implicated faulty brakes. Pascarello never repaired or inspected the dump trucks that the Petullos used to transport asphalt. He did not know that the trucks were uninsured. He also did not know that Angelo and Gerald had suspended licenses or that Gerald was a reckless or careless driver.

On December 6, 1990, Mavrikidis and her husband filed a complaint against Gerald, Angelo, Petullo Brothers, Geraldine Petullo (Angelo's wife), Ottavio Petullo (Angelo's brother), Newark Asphalt, and Clar Pine. One year later, an action brought by Motor Club of America Insurance Company (MCA) against defendants for recovery of property and medical benefits paid to plaintiff was consolidated with the present action. The jury trial was conducted between April 7 and April 15, 1994. At the close of testimony, the trial judge denied Newark Asphalt's request that the jury charge and verdict sheets be modified to incorporate its contention that *N.J.S.A.* 39:4–77 and *DeBonis v. Orange Quarry Co.*, 233 *N.J.Super.* 156, 558 *A.*2d 474 (App.Div.1989), place the burden of properly loading a truck on the owner/operator of the truck and not on the loader.

In special interrogatories, the jury found that Gerald operated his truck negligently on September 11, 1990, and that his negligence was a proximate cause of the accident. The jurors further found that Gerald was acting as an agent, servant and/or employee of Angelo at the time of the accident. In addition, the jury found that Newark Asphalt was negligent in overloading the truck and

that its negligence was also a proximate cause of plaintiff's injuries. Although the jury found Angelo and Petullo Brothers to be competent to perform the work for which they were engaged, it also found Clar Pine "negligent in engaging a careless, reckless or incompetent contractor" and that its negligence was a proximate cause of the accident and plaintiff's injuries. Furthermore, the panel found that Clar Pine retained control of the "manner and means" of performing the paving work at the station and that such work, "i.e. the transport and/or paving of hot asphalt, [was] an inherently dangerous activity."

Specifically, the jury determined that Gerald was 48% negligent; Angelo was 24% negligent; Newark Asphalt was 11% negligent; and Clar Pine was 17% negligent. The jury awarded $750,000 in damages to plaintiff and $30,000 to her husband *per quod.* In the consolidated action, the jury found Gerald solely liable for its award to MCA of $14,000 in property damages and $36,000 in medical expenses. Subsequently, the trial court molded the verdict. In that verdict, the court found Angelo vicariously liable for all of Gerald's negligence. Therefore, Angelo was liable for the 24% share attributed to him by the jury as well as the 48% attributed to Gerald. Based on the finding that Clar Pine was vicariously liable for its independent contractor, Angelo, the court entered a judgment against Clar Pine for 89% of the total damages awarded, including the 17% attributed directly to Clar Pine by the jury, the 24% attributed to Angelo, and the 48% attributed to Gerald. The court also entered judgment against Newark Asphalt for 11% of the total damages awarded. Clar Pine and Newark Asphalt appealed.

The Appellate Division reversed with respect to Clar Pine, holding there was insufficient evidence to support a finding of vicarious liability on the part of Clar Pine for the negligent acts of Gerald, Angelo, and Petullo Brothers, under any of the three relevant exceptions outlined in *Majestic, supra.* Therefore, the jury should not have considered those three exceptions. The court further found that there was insufficient evidence to support

a finding that Clar Pine was independently negligent in hiring Petullo Brothers. Finally, the Appellate Division rejected Newark Asphalt's argument as clearly without merit. In accordance with its decision, the court remanded for a reallocation trial to determine the degree of responsibility of Gerald, Angelo, and Newark Asphalt.

We granted certification to Clar Pine and Newark Asphalt, 148 *N.J.* 460, 690 *A.*2d 608 (1997), and now affirm the Appellate Division decision.

## II

■ The first question is whether Clar Pine is vicariously liable for plaintiff's injuries. As we explained in *Majestic, supra,* the resolution of this issue

> must be approached with an awareness of the long settled doctrine that ordinarily where a person engages a contractor, who conducts an independent business by means of his own employees, to do work not in itself a nuisance (as our cases put it), he is not liable for the negligent acts of the contractor in the performance of the contract.

> [30 *N.J.* at 430–31, 153 *A.*2d 321.]

*See also Bahrle v. Exxon Corp.,* 145 *N.J.* 144, 156, 678 *A.*2d 225 (1996) ("Ordinarily, an employer that hires an independent contractor is not liable for the negligent acts of the contractor in the performance of the contract."); *Baldasarre v. Butler,* 132 *N.J.* 278, 291, 625 *A.*2d 458 (1993) ("Generally ... the principal is not vicariously liable for the torts of the independent contractor if the principal did not direct or participate in them.").

■ The initial inquiry in our analysis is to examine the status of the Petullos in relation to Clar Pine. Despite plaintiff's alternate theories to the contrary, the Petullos were independent contractors rather than servants of Clar Pine.

> The important difference between an employee and an independent contractor is that one who hires an independent contractor "has no right of control over the manner in which the work is to be done, it is to be regarded as the contractor's own enterprise, and he, rather than the employer is the proper party to be charged with the responsibility for preventing the risk, and administering and distributing it."

[*Baldasarre, supra*, 132 *N.J.* at 291, 625 *A.2d* 458 (quoting W. Page Keeton, *Prosser & Keeton on the Law of Torts* § 71 (5th ed. 1984)).]

In contrast, a servant is traditionally one who is "employed to perform services in the affairs of another, whose physical conduct in the performance of the service is controlled, or is subject to a right of control, by the other." W. Page Keeton, *Prosser & Keeton, supra,* § 70 at 501.

In determining whether a contractee maintains the right of control, several factors are to be considered. The *Restatement (Second) of Agency* sets forth these factors, including:

(a) the extent of control which, by the agreement, the master may exercise over the details of the work;

(b) whether or not the one employed is engaged in a distinct occupation or business;

\*        \*        \*

(d) the skill required in the particular occupation;

(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

(f) the length of time for which the person is employed;

(g) the method of payment, whether by the time or by the job;

(h) whether or not the work is a part of the regular business of the employer; [and]

(i) whether or not the parties believe they are creating the relation of master and servant. . . .

[*Restatement (Second) of Agency* § 220(2) (1958).]

Applying those *Restatement* factors, it is evident that neither Angelo nor Gerald was a servant of Clar Pine. The masonry work required a skilled individual. Although Pascarello paid for three loads of asphalt, the Petullos provided their own tools and the remainder of the needed materials, other than bolts and plywood supplied by Pascarello to install the canopies. Their work did not involve the regular business of Clar Pine. In addition, the period of employment spanned only the time it took to lay the asphalt and concrete. Following the accident, the Petullos continued the job for which they were hired, which was approved by the Building Inspector of Montclair. In exchange for their services, the Petullos were not paid by the hour or month; instead, they received a discharge of the portion of their debt.

■ Based on that threshold determination, we now must determine whether this case falls within any exceptions to the general rule of nonliability of principals/contractees for the negligence of their independent contractors. There are three such exceptions, as delineated by the *Majestic* Court: "(a) where the landowner [or principal] retains control of the manner and means of the doing of the work which is the subject of the contract; (b) where he engages an incompetent contractor; or (c) where ... the activity contracted for constitutes a nuisance *per se*." *Majestic, supra,* 30 *N.J.* at 431, 153 *A.*2d 321.

Plaintiffs contend, albeit not too strongly, that Clar Pine also is guilty of the tort of negligently hiring an independent contractor. This Court recognized the tort of negligently hiring an incompetent, unfit, or dangerous *employee* in *DiCosala v. Kay,* 91 *N.J.* 159, 174, 450 *A.*2d 508 (1982). No New Jersey case, however, has extended that doctrine to hold that a contractee will be directly liable for his or her own negligence in selecting the contractor. *See, e.g., DiCosala, supra,* 91 *N.J.* at 174, 450 *A.*2d 508; *Schultz v. Roman Catholic Archdiocese,* 95 *N.J.* 530, 534, 472 *A.*2d 531 (1984); *Lingar v. Live–In Companions, Inc.,* 300 *N.J.Super.* 22, 29–30, 692 *A.*2d 61 (App.Div.1997); *Johnson v. Usdin Louis Co.,* 248 *N.J.Super.* 525, 529–31, 591 *A.*2d 959 (App.Div.), *certif. denied,* 126 *N.J.* 386, 599 *A.*2d 163 (1991).

In *DiCosala, supra,* 91 *N.J.* at 172, 450 *A.*2d 508, as one of the principal bases for that decision, we cited section 317 of the *Restatement (Second) of Torts* (1963), which states: "A master is under a duty to exercise reasonable care so to *control* his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them." (emphasis added). Comment a to that section expressly provides that the rule is "applicable only when the servant is acting outside the scope of his employment." *Id.* § 317 comment a. If the employee were acting within the scope of his employment, then the master may be vicariously liable under standard agency

principles. *Ibid.* In this case, however, there is no dispute that Gerald was acting wholly within his contractual duties.

In addition, the doctrine of *respondeat superior* does not ordinarily apply in the context of an independent contractor. Indeed, the status of an independent contractor is " 'characterized by the attributes of self-employment and self-determination in the economic and professional sense.' " *Ibid.* (quoting *Rokos v. State, Dep't of Treasury,* 236 *N.J.Super.* 174, 181, 564 *A.2d* 1217 (App. Div.1989)). By definition, then, the work done by an independent contractor is not overseen or controlled by the contractee. Accordingly, the basic premises underlying the tort of negligent hiring of an employee are lacking in the hiring of an independent contractor.

A prominent commentator, in discussing the negligence of the contractee, addressed a number of situations in which contractees are liable for their own negligence rather than that of their contractors:

> Where there is a foreseeable risk of harm to others unless precautions are taken, it is his duty to exercise reasonable care to select a competent, experienced, and careful contractor with the proper equipment.... So far as he in fact gives directions for the work, furnishes equipment for it, or retains control over any part of it, he is required to exercise reasonable care for the protection of others; and he must likewise interfere to put a stop to any unnecessarily dangerous practices of which he becomes informed, and make a reasonable inspection of the work after it is completed, to be sure that it is safe.... In all of these cases, he is liable for his personal negligence, rather than that of the contractor.
>
> [*Prosser & Keeton, supra,* § 71 at 510–11 (footnotes omitted).]

The above analysis comports with the imposition of liability on a principal under the three *Majestic* exceptions. We address more fully the question of whether this state recognizes a separate tort of negligently hiring an independent contractor in our discussion of the second *Majestic* exception.

### III

We now discuss each of the *Majestic* exceptions in turn. Under the first *Majestic* exception, the reservation of control "of the manner and means" of the contracted work by the principal

permits the imposition of vicarious liability. 30 *N.J.* at 431, 153 *A.*2d 321. "In such a case the employer is responsible for the negligence of the independent contractor even though the particular control exercised and its manner of exercise had no causal relationship with the hazard that led to the injury, just as in the case of a simple employer-employee situation." *Bergquist v. Penterman,* 46 *N.J.Super.* 74, 85, 134 *A.*2d 20 (App.Div.), *certif. denied,* 25 *N.J.* 55, 134 *A.*2d 832 (1957). Under that test, the reservation of control over the equipment to be used, the manner or method of doing the work, or direction of the employees of the independent contractor may permit vicarious liability. *Trecartin v. Mahony–Troast Constr. Co.,* 18 *N.J.Super.* 380, 387, 87 *A.*2d 349 (App.Div.1952), *aff'd,* 21 *N.J.* 1, 120 *A.*2d 733 (1956).

However, supervisory acts performed by the contractee will not give rise to vicarious liability under that exception. As indicated by the language of the exception, application of principles of *respondeat superior* are not warranted where the contractee's "supervisory interest relates [only] to the result to be accomplished, not to the means of accomplishing it." *Majestic, supra,* 30 *N.J.* at 431, 153 *A.*2d 321; *see also Marion v. Public Serv. Elec. & Gas Co.,* 72 *N.J.Super.* 146, 154–55, 178 *A.*2d 57 (App.Div.1962) (explaining that retention of broad supervisory power rather than "right to direct and control" did not subject contractee to vicarious liability for independent contractor's actions); *Trecartin, supra,* 18 *N.J.Super.* at 386, 87 *A.*2d 349 (recognizing that "[a] general contractor ... exercising only such general superintendence as is necessary to see that the subcontractor performs the contract, ordinarily has no duty to protect an employee of the subcontractor").

Pascarello's actions did not exceed the scope of general supervisory powers so as to subject Clar Pine to vicarious liability for Gerald's negligence. Providing blueprints, paying for some of the asphalt, and directing that a portion of the concrete be completed first are clearly within the scope of a contractee's broad supervisory powers. In addition, Pascarello's actions with regard to assem-

bling and placing the metal frame around the gasoline pumps and installing an explosion-proof system around the island did not amount to retention of control over the Petullos' work. Pascarello's actions related to the overall renovations of the station and not to the specific work for which the Petullos were engaged. The Petullos were hired to do the paving for the station and were not involved in the renovation other than the paving. The Appellate Division, therefore, correctly determined that there was insufficient evidence to present this issue to the jury. When the evidence is viewed in the light most favorable to plaintiffs, Pascarello's actions arose from a general supervisory power over the result to be accomplished rather than the means of that accomplishment.

## IV

Under the second *Majestic* exception, a principal may be held liable for injury caused by its independent contractor where the principal hires an incompetent contractor. As the Appellate Division explained in this case, "[t]he gravamen of th[is] exception is selection of a contractor who is incompetent. The selection of a competent contractor who negligently causes injury, does not render a [principal] liable." No presumption as to the negligence of an employer in hiring an independent contractor arises from the fact that, after being hired, the contractor is negligent in the performance of his duties and injures the person or property of another. *See* Reuben I. Friedman, Annotation, *When is Employer Chargeable with Negligence in Hiring Careless, Reckless, or Incompetent Independent Contractor,* 78 *A.L.R.*3d 910, 919 (1977).

In creating the second exception, the *Majestic* Court relied on an earlier Appellate Division decision in *Barnard v. Trenton–New Brunswick Theatres Co.,* 32 *N.J.Super.* 551, 108 *A.*2d 873 (1954). In *Barnard,* the court explained that:

'Where the work to be done is not *per se* a nuisance and injury results from the negligence of an independent contractor or his servants in the execution of it, the

contractor alone is liable unless the owner is in default in employing an unskillful or improper person as the contractor.'

[*Id.* at 558, 108 *A.*2d 873 (quoting *Terranella v. Union Bldg. & Constr. Co.*, 3 *N.J.* 443, 446–47, 70 *A.*2d 753 (1950)).]

The *Barnard* court concluded that there was no basis for holding the principal liable in that case, noting there was no evidence making "known to the [principal that the contractor was] unskillful or incompetent at the time of the employment." *Ibid.; see also Terranella, supra,* 3 *N.J.* at 447, 70 *A.*2d 753 (rejecting imposition of liability on principal where there was no suggestion that "the contractor lacked the requisite skill or qualifications for the work undertaken"). Here, too, there is no evidence that the Petullo Brothers were not skillful in executing the work for which they were hired: paving the service station. Rather, the proximate cause of the injuries to plaintiff was the negligence of Gerald in driving an overloaded truck with defective brakes through a red traffic light.

Because the second *Majestic* prong may include causes of action for both direct and vicarious liability, there is no reason to set out a separate tort for negligently hiring an independent contractor. To hold an employer liable under the second *Majestic* exception to the general rule of nonliability of principals for the negligence of their independent contractors, it is necessary to show both (1) that the contractor was incompetent or unskilled to perform the job for which he was hired, and (2) that the principal knew or had reason to know of the contractor's incompetence. The Petullos were skilled and experienced paving contractors. There is no evidence that the Petullos were unqualified to perform the masonry work for which they were hired. In fact, Pascarello visited other job sites that Angelo had paved in order to check the quality of his work. Viewing the evidence most favorably to plaintiffs, we find that the evidence does not support a finding that the Petullos were incompetent to perform the paving work for which they were engaged; hence, there is no basis for holding Clar Pine liable, either vicariously or directly, for plaintiff's injuries.

Moreover, the only knowledge attributed to Pascarello, emphasized by the dissent, falls into two categories: (1) Pascarello hired the Petullos to recoup the monies they owed him, *post* at 154–55, 707 *A*.2d at 995–96, and (2) Pascarello repaired some of Petullos' trucks and deemed them to be "junks" based on several exterior flaws, *post* at 156–57, 707 *A*.2d at 997. As to the first point, we reject the notion that financial irresponsibility is either equivalent to or a category of incompetence. *Cassano v. Aschoff*, 226 *N.J.Super.* 110, 116, 543 *A*.2d 973, *certif. denied*, 113 *N.J.* 371, 550 *A*.2d 476 (1988); *see also Restatement (Second) of Torts* § 411 comment g (1965) ("The rule stated in this Section makes the employer responsible only for his failure to exercise reasonable care to employ a contractor who is competent and careful. It has no application where the contractor, although competent . . . is financially irresponsible."). The dissent, however, asserts that there is sufficient evidence for a jury to conclude that Pascarello was negligent in hiring the Petullos because he knew they were incompetent contractors. In essence, the dissent asserts that a contractee who fails to consider a contractor's lack of financial stability may be guilty of hiring an incompetent contractor.[5] In doing so, however, the dissent erroneously equates the Petullos' financial status with incompetence.

In 1978, the Third Circuit in *Becker v. Interstate Properties*, 569 *F*.2d 1203, 1209 (1977), *cert. denied*, 436 *U.S.* 906, 98 *S.Ct.* 2237, 56 *L.Ed.*2d 404 (1978), predicted that this Court would "hold that the failure to engage a properly solvent or adequately insured subcontractor is a violation of the duty to obtain a competent independent contractor." In *Robinson v. Jiffy Executive Limousine Co.*, 4 *F*.3d 237, 240 (3d Cir.1993), however, the Third Circuit expressly overruled its earlier holding in *Becker* that financial irresponsibility could be considered as evidence of incompetence. In *Robinson*, the court expressed strong policy reasons why the *Becker* position

---

[5] In this case, the jury was given a charge that the jurors could consider Petullos' lack of insurance and lack of financial stability in determining whether they were incompetent contractors.

should be overturned. It relied on the strong dissent in *Becker* that stated:

> To my knowledge, New Jersey courts have never defined the scope of a tort *duty* on the basis of an individual's financial capabilities. The majority's decision will, I think, cause uncertainty and doubt for every financial strata and every court, as well as hinder the employment opportunities of an independent contractor trying to enter the marketplace but lacking much in the way of start-up capital.
>
> Behind this "duty" that the majority imposes lie significant policy questions relating to economic and social costs and benefits.
>
> [*Becker, supra,* 569 *F*.2d at 1216–17 (Hunter, J., dissenting).]

In *Robinson, supra,* the Third Circuit reiterated the reasoning of the *Becker* dissent that such a rule would hurt fledgling independent contractors trying to enter the marketplace and would also impose prohibitive obligations on employers of independent contractors, 4 *F*.3d at 242, such as average homeowners who retain an independent contractor through the yellow pages. Homeowners and business people, in order to protect themselves before hiring a plumber, painter, or other independent contractor, would need to investigate that contractor's financial background. Equating lack of insurance and financial responsibility with incompetence might also wreak havoc in particular industries, such as transportation, because persons or entities contracting for transportation services would be required to make continuing inquiry into the financial qualifications of the contractor. *See Robinson, supra,* 4 *F*.3d at 242.

Two Appellate Division panels also have rejected the *Becker* holding and have declined to rule that a contractor's lack of insurance or financial stability can be considered in determining whether the contractor is incompetent. *See Cassano, supra,* 226 *N.J.Super.* 110, 543 *A*.2d 973, *certif. denied,* 113 *N.J.* 371, 550 *A*.2d 476 (1988); *Miltz v. Borroughs–Shelving,* 203 *N.J.Super.* 451, 497 *A*.2d 516 (1985).

In *Cassano, supra,* an employee of an independent contractor's tree removal business sought to impose liability on the landowners for his injuries, which were sustained while working on the landowners' property at the landowners' direction. Although the independent contractor represented to the landowners that he was

fully insured, he in fact was covered by neither liability nor workers' compensation insurance. *Cassano, supra*, 226 *N.J.Super.* at 113, 543 *A.*2d 973. The plaintiff contended that the landowners should be vicariously liable for hiring an incompetent contractor "and in particular, a financially unstable one." *Id.* at 114, 543 *A.*2d 973. Rejecting that argument, the court explained that "[t]he fact that a contractor is negligent or incompetent in the manner in which he performs a particular job does not mean that he is incompetent generally. More to the point, [the independent contractor's] poor performance was only known ... in retrospect." *Ibid.* Further, the court stated:

> Although no court in this state, either before *Majestic*, or in the intervening nineteen years had chosen to apply [the concept of a tort duty based on financial capacity], the majority in *Becker* nevertheless predicted that future New Jersey courts would do so. No court has since chosen to follow that lead. In these circumstances, nor do we.
>
> [*Id.* at 116, 543 *A.*2d 973.]

The *Cassano* court also recognized that because the injured employee was covered by workers' compensation, the plaintiff already had a remedy for his accidental loss. Imposing liability on the landowners would adversely impact the workers' compensation system and subvert the parties' reasonable expectations. *Id.* at 117, 543 *A.*2d 973; *see also Jones v. Chevron U.S.A., Inc.*, 718 *P.*2d 890, 899 (Wyo.1986) ("The owner should not have to pay for injuries caused by the contractor when the worker[s'] compensation system already covers those injuries."). Although the public policy underlying the workers' compensation system is inapplicable to the facts in this case, a similar argument may be made with regard to uninsured motorist coverage. The Legislature has provided for protection of an innocent driver injured in an accident by an uninsured motorist by requiring auto insurers to provide uninsured motorist coverage in all automobile liability policies. *See Gorton v. Reliance Ins. Co.*, 137 *N.J.Super.* 558, 563–64, 350 *A.*2d 77 (App.Div.1975), *rev'd on other grounds*, 77 *N.J.* 563, 391 *A.*2d 1219 (1978).

The Appellate Division also rejected the theory that liability should be imposed against a general contractor because the subcontractor was "judgment-proof" in a case involving an injured third party rather than an employee of the contractor. *Miltz, supra,* 203 *N.J.Super.* at 466, 497 *A.2d* 516. In *Miltz, supra,* the plaintiff was injured on negligently installed steps in a department store and based her action against the general contractor on the financial insolvency of the subcontractor hired by that general contractor. In rejecting the plaintiff's lack of financial responsibility theory, the Appellate Division emphasized that "plaintiff cites no authority for the proposition that barring a plaintiff from recovery against a contractor or sub-contractor where the sub-subcontractor who has been found liable for [the] plaintiff's injuries is insolvent is contrary to New Jersey public policy." *Ibid.* The financial status of a contractor cannot be the basis for imputing liability to the principal who retained the contractor. A lack of insurance or lack of financial responsibility is not the equivalent or a category of incompetence. Accordingly, the court's charge to the jury in this regard was erroneous.

With regard to the dissent's second point, Pascarello's observation of the trucks in no way indicated that the right rear brake was defective. Although Pascarello admitted that the trucks used by Petullo Brothers were "junks," his observations of the vehicles were based on their exterior appearance and in no way indicated that the brakes on the truck were faulty. Indeed, Pascarello testified that all of Petullos' vehicles looked like "typical mason contracting trucks." The Petullos had several vehicles, including cars, small trucks, and large dump trucks. The testimony cited by the dissent refers primarily to the Petullos' small trucks. The evidence is undisputed that Pascarello never worked on the dump truck involved in this accident. *Post* at 158–59, 707 *A.2d* at 998. Moreover, the investigating officer of the commercial vehicle unit testified that the problems with the truck could not have been discovered without placing the truck on a lift, removing the wheels, and looking underneath the vehicle. The record demonstrates that Pascarello's automotive repair shop did not have the

lift necessary to inspect the dump truck involved in the accident and Pascarello had no knowledge that the right rear brake was inoperative. In addition, it is undisputed that Pascarello did not know that Angelo and Gerald had suspended licenses, were reckless or careless drivers, or that the trucks were uninsured. There was also no evidence in the record that Gerald ever had a prior automobile accident.

Imposing a duty on a contractee to check the driving record and credentials of the contractor's employees or to inspect the contractor's equipment would impose a very onerous burden on the contractee. Most, if not all, independent contractors transport their equipment and supplies to the contractee's premises. In the event that the contractor is involved in an automobile accident on the way to the job site, there is no precedent holding the contractee liable simply because the contractor was en route to the job location. A hypothetical applying a contrary result illustrates the fairness of that conclusion. For instance, if a construction contractor were hired to build an addition to a residence and he collided with another car on his way to the house, the property owner would not be liable for injuries to the passenger in the other car. Moreover, if the construction contractor's truck were carrying heavy planks and equipment necessary to perform its task, which fell off the truck during the accident and injured the third party, there would still be no basis for imposing liability on the property owner. The only distinction between the hypothetical and this case is the content of the truck driven by Gerald Petullo. Although plaintiff's injuries were particularly grim because the hot asphalt carried in Gerald's truck spilled onto her car, that fact bears no relevance as to the competence or incompetence of the Petullo Brothers. Logically, then, the contents of the truck should not change the liability of the employer. The contractee does not and should not be deemed negligent if he or she does not inquire and inspect the independent contractor's mode of transportation, unless the equipment or transportation consists of an inherently dangerous condition. As discussed below, the transport of asphalt does not constitute such a condition.

## V

Next, we consider the application of the third *Majestic* exception—whether the work engaged in by Petullo Brothers was inherently dangerous. In formulating this exception, the *Majestic* Court explained,

'where work is to be done that may endanger others, there is no real hardship in holding the party for whom it is done responsible for neglect in doing it. Though he may not be able to do it himself, or intelligently supervise it, he will nevertheless be the more careful in selecting an agent to act for him.'

[*Majestic, supra,* 30 *N.J.* at 440, 153 *A.2d* 321 (quoting *Covington & Cincinnati Bridge Co. v. Steinbrock,* 61 *Ohio St.* 215, 55 *N.E.* 618, 621 (1899)).]

We observed that "nuisance *per se* " could be equated with "inherently dangerous." *Id.* at 434–35, 153 *A.2d* 321. Namely, work can be considered to be inherently dangerous if it is

an activity which can be carried on safely only by the exercise of special skill and care, and which involves grave risk of danger to persons or property if negligently done. The term signifies that danger inheres *in the activity itself at all times, so as to require special precautions to be taken with regard to it to avoid injury. It means more than simply danger arising from the casual or collateral negligence of persons engaged in it under particular circumstances.*

[*Ibid.* (citations omitted) (emphasis added).]

*See also Prosser & Keeton, supra,* § 71 at 512–16.

The definition of inherently dangerous set forth in *Majestic* comports with the discussion in sections 413, 416, and 427 of the *Restatement (Second) of Torts* (1965) regarding a contractee's nondelegable duty to take special precautions against dangers that arise from inherently dangerous work. The comments and illustrations following those sections explain that in cases in which the work relates to the transport of materials, the contractee is not responsible for the ordinary risks or dangers associated with faulty brakes or poor driving. In discussing the meaning of "[p]eculiar risk and special precautions," comment b to section 413 states:

It is obvious that an employer of an independent contractor may always anticipate that if the contractor is in any way negligent toward third persons, some harm to such persons may result. Thus one who hires a trucker to transport his goods must, as a reasonable man, always realize that if the truck is driven at an excessive speed, or with defective brakes, some collision or other harm to persons on the

highway is likely to occur.... [Routine] precautions are the responsibility of the contractor....

[*Restatement (Second) of Torts, supra,* § 413 comment b.]

A peculiar risk is different "from the common risks to which persons in general are commonly subjected by the ordinary forms of negligence." *Id.* § 416 comment d. As a result, "the [contractee] is not liable for the contractor's failure to inspect the brakes on his truck, or for his driving in excess of the speed limit, because the risk is in no way a peculiar one, and only an ordinary precaution is called for." *Ibid.*

In *Ek v. Herrington,* 939 *F.*2d 839 (9th Cir.1991), the Ninth Circuit applied the three sections of the *Restatement (Second) of Torts* discussed above. In that case, decedent's heirs sued an independent contractor, who was hired to haul logs, and the owner of the logging operation, after the logs broke loose from the truck, landing on decedent's vehicle and causing her death. There, the brakes on the truck were defective and the truck was overloaded by at least 10,000 pounds. Addressing the issue of whether vicarious liability should be imposed on the logging operation for the hauler's negligence, the court held:

We accept the Restatement's suggestion that the risk posed by malfunctioning brakes is an ordinary one that an employer of an independent contractor has no duty to provide against. Similarly, we hold that the risk posed by overloading a logging truck is not a peculiar risk that arises in the normal course of logging and for which special precautions must be taken. It is a risk that would not arise, *but for the independent contractor's negligence, and which can be avoided by the ordinary precaution of not overloading the truck. An employer of an independent contractor is justified in presuming that a careful contractor will not create that risk* .... The duty rests solely on the shoulders of the independent contractor.

[*Id.* at 844 (emphasis added).]

Moreover, in a case with facts almost identical to those presented here, a California appellate court refused to impose vicarious liability on a contractee whose independent contractor struck and killed the plaintiff's decedent with his dump truck, which was loaded with asphalt. *A. Teichert & Son, Inc. v. Superior Court,* 179 *Cal.App.*3d 657, 225 *Cal.Rptr.* 10 (1986). In its decision, the court noted that "[the truck driver's] negligence, if any, entailed nothing more than ordinary failure to exercise due care in the

operation of a motor vehicle. This is not sufficient to invoke the 'special risk' exception to the rule of non-liability for the negligence of an independent contractor." *Id.* 225 *Cal.Rptr.* at 12.

Analogously, in this case, neither Gerald's negligent driving nor overloading the truck were inherent in the work being performed by Petullo Brothers. Clar Pine was justified in presuming that the Petullos would operate their vehicles safely and in accordance with the traffic laws; Clar Pine was further justified in presuming that the Petullos and their supplier would not overload their trucks. The risk of an accident between Gerald and an innocent third party was unrelated to the transportation of asphalt. Rather, the risk was directly connected to his negligent and careless driving (running the red light) as well as the failure of the brakes, which resulted from the overloading of the truck and/or its disrepair. Although the consequences of the accident were more severe due to the contents of the truck at the time of the accident, the accident itself did not arise out of any peculiar risk inherent to the transportation of asphalt.

Poor driving, faulty brakes, and overloading are ordinary risks associated with motor vehicles and the transport of materials, and as such, are the responsibility of the contractor. Clar Pine did not have a nondelegable duty to take special precautions to prevent those risks. Absent proof that the contractee was aware of an enhanced risk that Petullo Brothers would drive negligently or would overload their vehicles, Clar Pine will not be held vicariously or independently liable for the ordinary dangers that arise from normal human activity, in this case, driving. Plaintiff's injuries in this case resulted "from the casual or collateral negligence," *Majestic, supra,* 30 *N.J.* at 435, 153 *A.*2d 321, of the Petullos, which is not normal or inherent in paving.

The dissent agrees that the third *Majestic* exception does not apply. We suggest that without holding that a contractor who transports asphalt is engaged in an inherently dangerous activity, and therefore, subject to a "peculiar risk," a contractor cannot be

held liable for accidents that occur during the transport of asphalt. *See A. Teichert, supra*, 225 *Cal.Rptr.* at 12.

We observe that the trial court erroneously framed special interrogatory 9 to the jury as follows: "Was the work to be performed ... i.e. the transport and/or paving of hot asphalt, an inherently dangerous activity?" As the Appellate Division correctly found, the activity contracted for by Clar Pine was paving; transporting the asphalt to the job site was solely the responsibility of the Petullos. Similarly, one would not expect a contractee to be liable for injuries caused by a plumber who, while in transit from purchasing a sink to be installed on the contractee's premises, had an automobile accident.

In this case, reasonable men could not differ that the work for which Clar Pine contracted with Petullo Brothers, was not inherently dangerous. As a matter of law, Clar Pine was not vicariously liable under that exception.

## VI

We note that the jury's interrogatory responses do not warrant a remand for a new trial. Relevant to our discussion, the jury was presented with several special interrogatories, including:

6. a. Did Defendant, Clar Pine Servicenter, engage Gerald Petullo to perform construction/paving at its business premises and/or to transport asphalt?

6. b. Did Defendant, Clar Pine Servicenter, engage Angelo Petullo to perform construction/paving at its business premises and/or to transport asphalt?

6. c. Did Defendant, Clar Pine Servicenter, engage Petullo Bros., Inc. to perform construction/paving at its business premises and/or to transport asphalt?

\*     \*     \*

7. b. If your answer to question 6.b. was "Yes," was Angelo Petullo an incompetent contractor to perform the work for which he was engaged by Clar Pine Servicenter?

7. c. If your answer to question 6.c. was "Yes," was Petullo Bros., Inc. an incompetent contractor to perform the work for which it was engaged by Clar Pine Servicenter?

\*     \*     \*

10. a. Was Defendant, Clar Pine Servicenter negligent in engaging a careless, reckless or incompetent contractor?

If your answer is "Yes"....

10. b. Was such negligence the proximate cause of the accident and injuries complained of by Plaintiff?

The jury concluded that Clar Pine hired Angelo and Petullo Brothers, but not Gerald, to perform the asphalt work at the service station. The jury also concluded that neither Angelo nor Petullo Brothers were incompetent to perform the paving work. Despite answers to interrogatories 6a-c and 7a-c, which relate to the second *Majestic* exception, the jury curiously responded to interrogatory 10a-b, which relates to a contractee's direct liability, that Clar Pine was negligent in engaging an incompetent contractor. The most likely explanation for the jury's response that Clar Pine hired an incompetent contractor was that the jury attributed such incompetence to Gerald. That discrepancy is reconciled by the fact that the jury deemed Gerald to be the negligent actor in this case. The high percentage of fault attributed to Gerald by the jury indicates the panel's determination that Gerald was the one primarily responsible for Mavrikidis's injuries.

## VII

■ Finally, we hold that Newark Asphalt owed a common law duty to plaintiff not to overload the Petullos' trucks. In *DeBonis, supra*, an injured motorcyclist sued two defendant corporations who loaded trucks with stones, arguing that a contributing factor to his accident were stones at the site of the accident that had fallen off the trucks. 233 *N.J.Super.* at 158–59, 558 *A.2d* 474. Holding that the defendants owed the plaintiff a common law duty, the Appellate Division explained:

> Duty involves the concept of foreseeability, that is, whether a reasonably prudent person should have anticipated that injury to the plaintiff, or to those in a like situation, would probably result. A legal duty arises to take some action if harm to another is reasonably foreseeable in the event that it is not taken, or to refrain from taking some action if harm to another is reasonably foreseeable in the event it is taken. It is reasonably foreseeable under the circumstances of this case that trucks leaving the quarry overloaded or not secure would cause spillage and pose a threat of injury to plaintiff and others similarly situated.

[*Id.* at 164, 558 A.2d 474 (citations omitted).]

Similarly, in this case, it was reasonably foreseeable that Newark Asphalt's overloading of the Petullos' trucks could result in injury to plaintiff or others similarly situated. Therefore, even though Newark Asphalt was under no statutory duty not to overload the Petullos' truck, *N.J.S.A.* 39:4–77,[6] a common law duty remained "to load the trucks in such a manner that they were not overloaded and the load was secure." 233 *N.J.Super.* at 164, 558 *A.*2d 474. The Appellate Division correctly upheld the judgment against Newark Asphalt.

## VIII

We affirm the Appellate Division's judgment and remand for a reallocation trial to determine the appropriate percentage of liability to be attributed to the Petullos and Newark Asphalt. *N.J.S.A.* 2A:15–5.2 requires the jury to determine the full value of the injured party's damages as well as the percentage of each party's negligence. "[W]here the culpability of the parties is not an issue, but only the proximate cause effects of their action, comparative fault requires that *a jury compare the proximate cause elements to allocate responsibility." Bendar v. Rosen,* 247 *N.J.Super.* 219, 233, 588 *A.*2d 1264 (App.Div.1991) (emphasis added). In the instant action, since the jury improperly considered Clar Pine, its ability to accurately allocate the percentages of fault attributable to Gerald, Angelo, and Newark Asphalt was hindered.

Both plaintiffs and Newark Asphalt have stated that to avoid the burden and expense of another trial, the percentage of liability attributed to Clar Pine (seventeen percent) should be apportioned

---

[6] *N.J.S.A.* 39:4–77 provides in pertinent part:

No person shall cause or permit a vehicle to be so loaded or operate a vehicle so loaded that the contents or any part thereof may be scattered in any street. . . . The owner, lessee, bailee, or operator of any vehicle described above found on a highway in violation of any such safety standard or procedure . . . shall be fined. . . .

to the remaining defendants on a *pro rata* basis. If the parties agree, a reallocation trial may be avoided.

STEIN, J., dissenting.

The ultimate question raised by the record and the majority opinion is the extent to which this Court is at liberty not to adhere to its own precedents. In *Brill v. Guardian Life Insurance Co. of America*, 142 *N.J.* 520, 666 *A.*2d 146 (1995), a precedent of substantial consequence, we emphasized that for purposes of deciding motions for a directed verdict, for judgment notwithstanding the verdict and for summary judgment, "the essence of the inquiry in each is the same: 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Id.* at 536, 666 *A.*2d 146 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 *U.S.* 242, 251–52, 106 *S.Ct.* 2505, 2512, 91 *L. Ed.*2d 202, 214 (1986)). Despite *Brill*'s mandate, the Court affirms the Appellate Division's judgment in favor of respondent Clar Pine Servicenter (Clar Pine) notwithstanding a jury verdict against it. The jury verdict against Clar Pine was based in part on a jury finding that Clar Pine negligently hired an incompetent contractor, a finding that was supported by substantial evidence in the record, and unquestionably by sufficient evidence to withstand a motion under *Rule* 4:40–2 for judgment notwithstanding the verdict based on the standard we promulgated in *Brill*.

I

After a twelve-day trial, an Essex County jury returned a $750,000 damages verdict in favor of petitioner Alice Mavrikidis and $30,000 for her husband's *per quod* claim. The damages awarded to petitioner Alice Mavrikidis were to compensate her for severe burns and other injuries she sustained when a dump truck overloaded with hot asphalt and operating with defective brakes went through a red light, collided with petitioner's car, struck a telephone pole and then overturned onto petitioner's car. Petitioner's burns from the hot asphalt, consisting of second and third-

degree burns over twenty-one percent of her body, were so severe that she was relocated from University Hospital in Newark to the burn center at St. Barnabas Hospital, where she underwent extensive skin-grafting surgery during a three and one-half week hospitalization. Unable to work for one and one-half years after the accident, her residual injuries included permanent scarring to parts of her body where skin grafting was required.

The jury verdict apportioned 72% of liability to Angelo and Gerald Petullo (24% to Angelo and 48% to Gerald), the father and son who respectively owned and drove the unregistered and uninsured dump truck and had been hired by Clar Pine to transport the asphalt and repave Clar Pine's gasoline station; 11% to Newark Asphalt for overloading the dump truck; and 17% to Clar Pine. That apportionment was based on a jury verdict that determined that (1) Clar Pine retained control over the Petullo's performance of the work for Clar Pine; (2) Clar Pine negligently hired an incompetent contractor; and (3) the transport of hot asphalt is inherently dangerous. Relying on this Court's decision in *Majestic Realty Associates, Inc. v. Toti Contracting Co.,* 30 *N.J.* 425, 153 *A.*2d 321 (1959), the trial court held that Clar Pine was vicariously liable for the Petullo's negligence and entered judgment holding Clar Pine liable for 89% of the damages awarded.

In an unreported opinion, the Appellate Division held as a matter of law that the trial record did not present a jury question on any one of the three grounds of liability on which the jury verdict against Clar Pine was based, and therefore ordered the entry of judgment notwithstanding the verdict, see *Rule* 4:40-2, in favor of Clar Pine. That court remanded the matter to the Law Division for a retrial to reapportion liability between the Petullos and Newark Asphalt. This Court now affirms the judgment of the Appellate Division.

## II

The soundness of the Court's disposition depends in part on its application of our holding in *Majestic, supra,* 30 *N.J.* 425, 153 *A.*2d

321. That case involved a suit against the City of Paterson's Parking Authority for damages that resulted when the wall that its independent contractor was demolishing collapsed onto the roof of plaintiff's adjoining building. *Id.* at 429, 153 *A.*2d 321. The Court referred to the long-settled doctrine "that ordinarily where a person engages a contractor, who conducts an independent business by means of his own employees, . . . he is not liable for the negligent acts of the contractor in the performance of the contract." *Id.* at 430–31, 153 *A.*2d 321. The Court acknowledged that three exceptions to that doctrine have been generally accepted:

(a) where the landowner retains control of the manner and means of the doing of the work which is the subject of the contract; (b) where he engages an incompetent contractor; or (c) where . . . the activity contracted for by the landowner is inherently dangerous or involves a peculiar risk of harm to others unless special precautions are taken.

[*Id.* at 431, 438, 153 *A.*2d 321.]

Focusing on the third exception, the Court observed that an inherently dangerous activity "means more than simply danger arising from the causal or collateral negligence of persons engaged in it under particular circumstances," but rather is a term that "signifies that danger inheres in the activity itself at all times, so as to require special precautions to be taken with regard to it to avoid injury." *Id.* at 435, 153 *A.*2d 321. The Court concluded that the demolition of a building directly adjacent to another building, for which the Paterson Parking Authority had engaged an independent contractor, constituted an inherently dangerous activity concerning which the Authority's duty to perform the demolition with due care was non-delegable. *Id.* at 438, 153 *A.*2d 321. In imposing vicarious liability on the Parking Authority for the damages caused by its contractor's negligence, the Court observed:

It is urged that such a burden ought not to be imposed upon a landowner who is not competent to do the work himself and so must turn to a person following the necessary independent calling in the particular field to accomplish the result sought. But in the resolution of the conflicting interests of the innocent injured person and the landowner who chose the contractor, justice and equity demand recognition of the absolute duty.

[*Id.* at 439, 153 *A.*2d 321.]

Applying the *Majestic* exceptions to this record, the Court holds that as a matter of law the first *Majestic* exception was inapplicable because the evidence did not raise a jury question whether Clar Pine reserved control "of the manner and means" of the contracted work. The Court observes that "[w]hen the evidence is viewed in the light most favorable to plaintiffs, [Clar Pine's] actions arose from a general supervisory power over the result to be accomplished rather than the means of that accomplishment." *Ante* at 136, 707 *A.*2d at 986. I agree with that conclusion.

The Court also holds as a matter of law that the evidence did not present a jury question on whether the work that the Petullos agreed to perform for Clar Pine was inherently dangerous. *Ante* at 143–46, 707 *A.*2d at 989–91. In reaching that conclusion the Court too narrowly describes the work to be performed as merely "paving," observing that because the transport of the asphalt to the job site was solely the Petullos' responsibility, it was not part of the work contracted for by Clar Pine. *Ante* at 145–46, 707 *A.*2d at 991. In my view, the Court's characterization of the scope of the work is unrealistically technical and does not acknowledge that the transport of asphalt to the job site was inextricably related to the paving the Petullos were to perform. Nevertheless, I agree that neither paving nor the transport of hot asphalt involves "danger [inherent] in the activity itself at all times, so as to require special precautions to be taken with regard to it to avoid injury." *Majestic, supra,* 30 *N.J.* at 435, 153 *A.*2d 321. See *Restatement (Second) of Torts,* § 416 (1965).

Because our decision in *Majestic* focused on the "inherently dangerous activity" exception, the opinion did not elaborate on the analytical basis for the second *Majestic* exception based on hiring of an incompetent contractor. As the prevailing authorities make clear, the analytical basis for imposing liability on a person who engages an incompetent contractor derives from principles of

negligence. See *Restatement (Second) of Torts,* § 411, which states:

Negligence in Selection of Contractor

An employer is subject to liability for physical harm to third persons caused by his failure to exercise reasonable care to employ a competent and careful contractor

(a) to do work which will involve a risk of physical harm unless it is skillfully and carefully done, or

(b) to perform any duty which the employer owes to third persons.

Comment a to § 411 defines a competent and careful contractor as "a contractor who possesses the knowledge, skill, experience, *and available equipment* which a reasonable man would realize that a contractor must have in order to do the work which he is employed to do *without creating unreasonable risk of injury to others.*" (emphasis added).

The leading cases echo the *Restatement*'s formulation. *See Wilson v. Good Humor Corp.,* 757 *F.*2d 1293, 1309 (D.C.Cir.1985) ("Employers can be found directly liable under ordinary negligence principles for hiring an independent contractor if the employer knew or reasonably should have known that the contractor was not competent *and* if the contractor's incompetence proximately caused injury to others."); *L.B. Foster Co. v. Hurnblad,* 418 *F.*2d 727, 729–32 (9th Cir.1969); *Risley v. Lenwell,* 129 *Cal.App.*2d 608, 277 *P.*2d 897, 907–08 (1954). *See also* J.D. Lee and Barry A. Lyndahl, *Modern Tort Law* § 8.03, at 222 (1991) ("An employer may be liable for the negligent acts of an independent contractor if the employer fails to exercise due care in the selection of a competent independent contractor."); W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 71, at 510 (5th ed. 1984) (same); Reuben I. Friedman, Annotation, *When is Employer Chargeable with Negligence in Hiring Careless, Reckless or Incompetent Contractor,* 78 *A.L.R.*3d 910 (1977) (same).

Consistent with the Court's treatment in *Majestic* of the liability of one who hires an independent contractor to perform inherently dangerous work, the employer of a negligently selected contractor would be vicariously liable for any negligent acts of that contractor that are related to the reasons why his hiring was improper.

Comment b to § 411 of the *Restatement* sets forth the prevailing rule:

> The employer of a negligently selected contractor is subject to liability under the rule stated in this Section for physical harm caused by his failure to exercise reasonable care to select a competent and careful contractor, but only for such physical harm as is so caused. In order that the employer may be subject to liability it is, therefore, necessary that harm shall result from some quality in the contractor which made it negligent for the employer to entrust the work to him.

Accordingly, the trial court erred when it allowed the jury to allocate fault among Clar Pine, the Petullos and Newark Asphalt. The correct allocation should have been between the Petullos and Newark Asphalt, with Clar Pine vicariously liable for the percentage of fault allocated to the Petullos.

The Court superficially describes the trial record on the issue of the Petullos' competence and observes that "[v]iewing the evidence most favorably to plaintiffs, we find that the evidence does not support a finding that the Petullos were incompetent to perform the paving work for which they were engaged; hence, there is no basis for holding Clar Pine liable ... for plaintiff's injuries." *Ante* at 137, 707 *A*.2d at 986–87.

Substantial evidence in the record supported the jury's finding that Clar Pine was negligent in hiring the Petullos to pave and to transport hot asphalt to the job site. The testimony of Karl Pascarello, the owner of Clar Pine, strongly suggested that his primary reason for hiring the Petullos was that they owed him around eighteen to twenty thousand dollars for gasoline and repairs and that requiring them to do the paving job was the only way to recoup some of his money. Pascarello testified that his service station had been operating since 1972, that he sold gasoline and made repairs on all makes and models of cars and trucks, and that the Petullos had been customers for twenty-two years. He was asked about his relationship with the Petullos in September 1990:

> Q. Now, thinking back to September, 1990, what was your relationship with Petullo Brothers, Inc.?
>
> A. They owed me a lot of money.
>
> Q. What was that for?

A. Gasoline that they purchased.

Q. Uh, huh, and is it just gasoline?

A. Ninety-five percent of it.

Q. And what's the remainder?

A. Oh, maybe we do a tune up on their vehicle, you know, sell them a battery, that was about it. They basically did all the work themselves.

Q. What would you do—and what would you do, you kept a running tab of all the—

A. House account.

Q. And how would you get paid?

A. Usually cash. When he had the money because I refused to take checks from him because he bounced too many of them.

Pascarello also testified that he had stopped extending credit to the Petullos because they bounced checks and consistently broke promises to pay down their account:

Q. Did there come a time when you no longer allowed them to obtain gas on credit, that you demanded cash?

A. They have a ceiling. Like for instance, now they'll get no more than $100. Once they reach their limit of $100, they don't get nothing from me until they pay that $100.

Q. So there's a $100 credit limit at this time for Petullo Brothers Inc.?

A. Correct.

Q. Was there any type of limit at the time of this accident in 1990?

A. They were off. In other words, at that time, 1990, they were not getting no more credit from me. I was just trying to recoup my losses from them. Monies owed to me.

Q. So the answer to my previous question as to whether there came a time when you no longer were willing to extend credit to Petullo Brothers Inc. would be yes.

A. Yes.

Q. How long before the accident did you stop extending credit to Petullo Brothers Inc.?

A. I really don't remember.

Q. Was it more than a year before?

A. I don't remember. I'll be honest with you, I went around and around chasing my money forever with them.

Q. You went around and around chasing your money?

A. Yes—yeah. He's the type of guy that says, Karl, I'll be in Friday, and I'll give you $1,000. And Friday comes and goes and the next Friday comes and goes and it's just constantly running.

Q. Do you know how long you were chasing this money down after you stopped extending credit?

A. He's always owed me money, okay? Whether it was because he'd wait to finish a job and if he was on the job for a month and finally he'd give me the money and if the check bounced, it was just nonsense.

Pascarello also testified that in hiring the Petullos to perform the paving work at his station he was influenced as much by the money they owed him as he was by their ability to do the work:

Q. Okay. So you weren't too concerned with the 20K, you were more concerned with Petullo Brothers' reputation.

A. No. It was equal. I cared about my 20K.

Q. But you indicated before that you were more interested in the reputation more than the $20,000.

A. Well the work had to be done.[1]

Portions of Pascarello's deposition testimony, in which he described the Petullos' vehicles, were also read into the record:

Q. How many vehicles did they have?

A. They were in and out of vehicles constantly. So they had an old pick up truck, they had an old dump truck. The dump truck we never serviced, that just got gas. The pick up truck, maybe we did a tune up on it, or an oil change. Usually it was, basically get it through inspection, get it through inspection type of deal. Lights never worked, this never worked.

Q. Are you an inspection agency as well?

A. No, but we do the work to try to get it through.

Q. What other equipment, if any, if you know, that Petullo Brothers owned?

A. He has one machine too. He has—it's like a pay loader I guess.

Q. And is that pretty much it? That you ever saw?

A. Yeah, yeah. Everything was junks to be honest with you.

. . . .

---

[1] The Court's opinion misconstrues the significance of Pascarello's testimony that he hired the Petullos to recoup some of the money they owed him. The Court incorrectly assumes that that testimony suggests that the Petullos were incompetent because they were financially irresponsible, and devotes five pages of its opinion to the repudiation of an argument never advanced. *Ante* at 138–41, 707 A.2d at 987–88. The point of Pascarello's testimony about his determination to recover a portion of the Petullos' debt is that it would permit a jury to infer that although he knew that the Petullos' trucks were unfit to haul asphalt safely, he hired them without concern for the danger they posed because his primary motive was to recoup some of their indebtedness to him.

Q. You said earlier this dump truck, I'll ask you again, what kind of shape was this dump truck in that was bringing the asphalt to the station.

A. It ran. What can I tell you. It ran and dumped.

Q. Did you use the word junky before?

A. Most of this equipment is all junk.

During his direct testimony, Pascarello was asked what he meant by his deposition testimony in which he described the Petullos' trucks as "junks." "Junks, meaning that the fenders—the doors had buckles in them, the bumpers were dented, you know, that the truck looked a mess. Okay, it—the fenders were banged, the grills were broken, the tailgates were bent. Basically facial."

During cross-examination Pascarello described the trucks in somewhat more detail, observing that

[t]he fenders, doors, banged up, could have a cracked windshield, you know, typical mason contracting truck.... Tailgates were loose, you know ... pins might have been missing, one pin might have been missing or a bolt was put in its place where a pin should have been. Basically did the same job, but, you know, wasn't proper.... Well, maybe they weren't closed all the way because the back of the truck was bent. They wouldn't fit into the eyes where the pins go.

The cross-examination continued:

Q. How about bald tires?

A. They had bald tires.

Q. Constantly?

A. At times. There were some bald tires.

Q. Do you remember—you testified at a hearing back in November describing his vehicles, they run three days, five days, they break down.

A. Uh huh.

Q. Well what broke down? And you answered, blew a clutch, drop a clutch rod, flat tires, constantly had bald tires.

A. Okay.

Although Pascarello's deposition testimony indicated that he sometimes worked on the Petullos' pick-up truck to help it pass inspection, he gave contradictory testimony at trial, acknowledging that the Petullos probably did not get their trucks inspected:

Q. At times, did you—Mr. Pascarello, did you work on the—I realize that Mr.—that the Petullos had several vehicles, is that right?

A. That's correct.

Q. In fact they were in and out of vehicles all the time, isn't that right?

A. That's correct.

Q. The junks would come and go?

A. I guess.

Q. And at times you would work on repairing them to get them through inspection, is that right?

A. No.

Q. You helped him sometimes get some of his vehicles through inspection?

A. If they had a miss in it or something like that. To be honest with you they probably—well, I don't know if you—you know, probably didn't get them inspected.

Q. Probably didn't get them inspected. Did you notice whether or not the trucks ever had inspection stickers on them?

A. I didn't really notice.

Pascarello was asked again about the inspections:

Q. Incidentally, I believe you testified—I believe your words were to the effect, to be honest, they probably didn't get the vehicles inspected. Do you remember that? You were talking to—

A. Just now, a while ago?

Q. Yes.

A. Yeah.

Q. Yeah. I'm sorry.

A. Uh huh. See I don't do inspection work.

Q. I see. Well my question is—

A. In other words I don't put stickers on.

Q. —did you care at all whether their vehicles were inspected? That you were hiring these guys to do this job?

A. To tell you—it never came into my mind.

Evidence adduced at trial revealed that after the accident Gerald Petullo pled guilty in Bloomfield Municipal Court to charges of disregarding a traffic signal, driving while on the suspended list and driving without insurance on his vehicle. Angelo Petullo pled guilty to driving while on the suspended list, and Petullo Brothers, their inactive corporation, pled guilty to operating an unsafe and overweight vehicle. That plea was based on an inspection of the Petullos' dump truck a few days after the accident that revealed that the truck had no right rear brake, that its weight at the time of the accident exceeded its registered gross vehicle weight by 866 pounds, and that the combined weight of the

cargo plus the truck axle exceeded the amount allowed by statute by 5,106 pounds. Moreover, plaintiff's traffic safety expert expressed the opinion that the Petullos' truck was overloaded by eighty-two percent.

Pascarello never admitted that he had performed mechanical work on the Petullos' dump truck, although he acknowledged making repairs on their pick-up truck, and never conceded that he believed the truck to be unsafe or without a right rear brake. Had he done so he would have admitted liability under *Majestic*. What he did concede was that the trucks were "junks," had bald tires, broke down constantly, had a "beat-up" appearance, and were not subjected to annual motor vehicle inspections. Moreover, his testimony expressly acknowledged that the Petullos were "deadbeats" who frequently issued bad checks, and that hiring them to pave his station was the only practical way to get back some of the money they owed him. Accepting as true the evidence supporting plaintiff's position, and according it all reasonable inferences to be deduced from that testimony, the question is whether a reasonable jury could find by a preponderance of the evidence that Clar Pine negligently hired the Petullos to pick up and deliver hot asphalt and pave the service station.

Merely to state the question compels an affirmative answer. The jury could have inferred that Pascarello, although admitting some familiarity with the trucks, understated his actual knowledge that they were mechanically defective and unsafe for transporting heavy loads. The jury could infer that Pascarello knew that the trucks were not taken for inspection because they could not pass inspection, and could have inferred that the missing right rear brake on the dump truck was one of the reasons that truck was not inspected. The jury could infer that Pascarello was so determined to recoup some of his twenty thousand dollar extension of credit that he was unconcerned about the safety of the Petullos' trucks. In short, considering the evidence in the light most favorable to plaintiff, the jury could find that Clar Pine negligently hired an incompetent contractor. Surely, the evidence on that

question is not "so one-sided that [Clar Pine] must prevail as a matter of law." *Liberty Lobby, supra,* 477 *U.S.* at 251–52, 106 *S.Ct.* at 2512, 91 *L. Ed* 2d at 214.

Recognition that this record presents a jury question concerning Clar Pine's breach of its duty of care in selecting an incompetent contractor does not imply that a corresponding duty would exist if the employer were a homeowner or a business proprietor less familiar than Clar Pine with matters of vehicular maintenance. "The question of whether a duty to exercise reasonable care to avoid the risk of harm to another exists is one of fairness and policy that implicates many factors." *Carvalho v. Toll Bros. & Developers,* 143 *N.J.* 565, 572, 675 *A.*2d 209 (1996). In assessing whether to impose a duty of care, courts consider not only the foreseeability of harm to the injured party but also address whether considerations of fairness and policy warrant the imposition of such a duty. *Carter Lincoln–Mercury, Inc. v. EMAR Group, Inc.,* 135 *N.J.* 182, 194–95, 638 *A.*2d 1288 (1994). That inquiry "involves identifying, weighing, and balancing several factors—the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution." *Hopkins v. Fox & Lazo Realtors,* 132 *N.J.* 426, 439, 625 *A.*2d 1110 (1993). Suffice it to observe that not every employer of a mason contractor would possess, as Clar Pine did, the "opportunity and ability to exercise care" on a level adequate to support the legal conclusion that a breach of duty occurred.

## III

The Court's opinion in *Brill v. Guardian Life Insurance Co. of America, supra,* 142 *N.J.* at 537, 666 *A.*2d 146, took pains to point out that despite our new summary judgment standard "the right of trial by jury remains inviolate." We observed that "the summary judgment standard we adopted does not 'denigrate the role of the jury.'" *Ibid.* (quoting *Liberty Lobby, supra,* 477 *U.S.* at

255, 106 *S.Ct.* at 2513, 91 *L. Ed.*2d at 216). We stressed that under our new standard

> a determination whether there exists a "genuine issue" of material fact that precludes summary judgment requires the motion judge to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party. The "judge's function is not himself [or herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."
>
> [*Brill, supra,* 142 *N.J.* at 540, 666 *A.*2d 146 (citation omitted).]

The Court today, without explanation or justification, fails to follow its own standard. Answering interrogatory ten the jury determined that Clar Pine negligently hired an incompetent contractor and that that negligence was a proximate cause of plaintiff's injuries. That finding, under *Majestic,* would render Clar Pine vicariously liable for all fault imputed to the Petullo defendants by the jury. In spite of a record that indisputably raises a jury question concerning Clar Pine's negligence, the Court ignores *Brill* and awards Clar Pine judgment notwithstanding the jury verdict.

I would reverse the judgment of the Appellate Division and remand the matter for retrial on liability only against all defendants.

HANDLER and O'HERN, JJ., join in this opinion.

*For affirmance and remandment*—Chief Justice PORITZ, and Justices POLLOCK and COLEMAN—4.

*For reversal and remandment*—Justices STEIN, HANDLER and O'HERN—3.