692 A.2d 61

COMMANDER AILON B. LINGAR AND MARIA LINGAR, HIS WIFE, PLAINTIFFS-APPELLANTS, v. LIVE-IN COMPANIONS, INC., BONNIE PARSONS OECHSLE AND JOSEPH S. OECH-SLE, SR., DEFENDANTS-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued March 26, 1997—Decided April 17, 1997.

24

Before Judges BAIME, PAUL G. LEVY, and BRAITHWAITE.

*Dennis J. Crawford* argued the cause for appellants (*Duffy & Quinn*, attorneys; *Mr. Crawford*, of counsel; *Eric J. Riso*, on the brief).

*Bradley Wilson* argued the cause for respondents (*Sachs, Maitlin, Fleming, Greene & Wilson*, attorneys; *Allan Maitlin*, on the brief).

BAIME, J.A.D.

Maria Lingar retained Live–In Companions, Inc. to care for her disabled husband, Naval Commander Ailon Lingar, while she went on a trip. Live–In Companions assigned Kenneth Mack to attend to Ailon in Maria's absence. While Maria was away, Mack abandoned Ailon and stole several items from her home. Plaintiffs brought this action against Live–In Companions, its owner and director, Bonnie Oechsle, and her husband, Joseph Oechsle, seeking compensatory and punitive damages. The trial court granted defendants' motion for partial summary judgment and dismissed plaintiffs' claims for negligent and intentional infliction of emotional distress, conversion and invasion of privacy. At the close of plaintiffs' case, the trial court dismissed all of Ailon's claims and all of the claims against Joseph Oechsle. The trial court also dismissed Maria's claim for breach of contract and her demand for punitive damages. At the close of all the evidence, the trial court dismissed Maria's remaining claims for negligent hiring and consumer fraud. Judgment was entered accordingly. Plaintiffs appeal. We affirm in part and reverse in part.

I.

Plaintiffs were married in 1947. Early in the marriage, Ailon suffered a ruptured cerebral aneurysm, leaving him totally disabled and in need of "around-the-clock" care.

In September 1993, Maria retained Live–In Companions to care for Ailon during her absence while on a trip. In her discussions with Bonnie Oechsle, Maria emphasized the nature and extent of Ailon's needs. Maria stressed that she was looking for someone who was "very reliable" to feed, bathe and attend to the personal needs of her husband and to administer the appropriate medication for his heart and for preventing seizures. Bonnie responded that Maria could "depend" on Live–In Companions because of the high quality of its employees. Maria also had received a brochure from Live–In Companions which represented that its "reliable employees" would "assist with washing, dressing and helping individuals as needed" and would "provide friendship [and] someone to talk to and be there" when the primary care-giver could not. The brochure also contained the representation that "[a]ll employees [were] supervised and a close relationship [was] maintained between [the] employees, clients, client's families, and [Live–In Companion's] administration."

On the day of Maria's trip, Live–In Companions assigned Kenneth Mack to care for Ailon. Bonnie had hired Mack in May 1993, based upon the recommendation of one of Live–In Companion's trusted employees. Although Mack had represented on his application for employment that he had not been convicted of a "felony" in the last seven years, he had a formidable record of criminal and disorderly persons convictions for offenses ranging from possession and distribution of cocaine to shoplifting, trespassing, and receiving stolen property. In response to questions propounded in the application, Mack had indicated that he did not have a driver's license. It was Bonnie's practice to "pre-screen" applicants by conversing with them on the telephone and to conduct pre-hiring interviews. No further investigation was generally

undertaken. Bonnie stressed that she would not have hired Mack had she known of his checkered history.

While Maria was away, Mack abandoned Ailon and stole various items, including Maria's automobile. Fortunately, family members quickly discovered the problem, but both Maria and Ailon claimed that they were emotionally traumatized by the incident.

On appeal, plaintiffs advance a plethora of arguments attacking the Law Division's pretrial and trial decisions. For the purpose of clarity, we do not treat these claims chronologically. Instead, we first address plaintiffs' argument that the trial court erred by dismissing their claims for consumer fraud and negligent hiring. We find merit in these contentions and reverse and remand for a new trial on these counts. We reject the remainder of plaintiffs' arguments.

## II.

Initially, we consider plaintiffs' argument that the trial court erroneously dismissed their claim of consumer fraud. The trial court granted an involuntary dismissal because it viewed Bonnie's statements and the representations made in the Live–In Companion brochure as mere "puffery." We disagree with this conclusion and reinstate plaintiffs' claim.

We begin our analysis with the operative language of the Consumer Fraud Act (*N.J.S.A.* 56:8–8 to –48). *N.J.S.A.* 56:8–2 provides:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid ... is declared to be an unlawful practice; ....

Under the Act, the word "merchandise" includes "services ... offered, directly or indirectly to the public for sale." *N.J.S.A.* 56:8–1(c).

The statutory language is to be liberally construed in favor of consumers. *Cox v. Sears Roebuck & Co.*, 138 *N.J.* 2, 15, 647 *A.2d* 454 (1994); *Barry v. Arrow Pontiac, Inc.*, 100 *N.J.* 57, 69, 494 *A.2d* 804 (1985); *Levin v. Lewis*, 179 *N.J.Super.* 193, 200, 431 *A.2d* 157 (App.Div.1981); *State v. Hudson Furniture Co.*, 165 *N.J.Super.* 516, 520, 398 *A.2d* 900 (App.Div.1979). The legislative objective was to protect the public from sharp practices and dealings in the marketing of real estate, goods, and services. *Gennari v. Weichert Co. Realtors*, 288 *N.J.Super.* 504, 533, 672 *A.2d* 1190 (App.Div.), *leave to appeal granted*, 146 *N.J.* 64, 679 *A.2d* 652 (1996). Toward that end, the Act was broadly designed to protect the consumer, even when the merchant acts in good faith. *D'Ercole Sales, Inc. v. Fruehauf Corp.*, 206 *N.J.Super.* 11, 23, 501 *A.2d* 990 (App.Div.1985); *Skeer v. E.M.K. Motors, Inc.*, 187 *N.J.Super.* 465, 470, 455 *A.2d* 508 (App.Div.1982).

The necessary predicate to application of the Act is the commission of "any unconscionable commercial practice." *N.J.S.A.* 56:8- 2; *see also Gennari v. Weichert Co. Realtors*, 288 *N.J.Super.* at 533, 672 *A.2d* 1190. Unconscionable practices "fall into two general categories under *N.J.S.A.* 56:8–2, affirmative acts and knowing omissions." *Id.* at 534, 672 *A.2d* 1190. Where, as here, the representation is affirmative, the Act permits recovery of the consumer's loss and imposition of treble damages and attorney's fees, *N.J.S.A.* 56:8–1(a), "without any showing of an intent to deceive or even negligence" on the part of the defendant. *Ibid.*; *see also Strawn v. Canuso*, 140 *N.J.* 43, 60, 657 *A.2d* 420 (1995); *Cox v. Sears Roebuck & Co.*, 138 *N.J.* at 17–18, 647 *A.2d* 454; *Chattin v. Cape May Greene, Inc.*, 124 *N.J.* 520, 522, 591 *A.2d* 943 (1991) (Stein, J. concurring).

We do not regard the statements contained in the brochure or those made by Bonnie as "exaggerated claim[s] of quality," *Miller v. American Family Publishers*, 284 *N.J.Super.* 67, 81, 663 *A.2d* 643 (Ch.Div.1995), or as "unactionable [declarations] of opinion," *Byrne v. Weichert Realtors*, 290 *N.J.Super.* 126, 136, 675 *A.2d* 235 (App.Div.), *certif. denied*, 147 *N.J.* 259, 686 *A.2d* 761 (1996), or as

"nothing more than puffery," *Rodio v. Smith*, 123 *N.J.* 345, 352, 587 *A.*2d 621 (1991). The statements made were "susceptible of personal knowledge," *Joseph J. Murphy Realty, Inc. v. Shervan*, 159 *N.J.Super.* 546, 551, 388 *A.*2d 990 (App.Div.1978), *certif. denied*, 79 *N.J.* 487, 401 *A.*2d 242 (1979), and were represented in such a way "that the consumer could reasonably treat [them] as [declarations] of fact." *Borcherding v. Anderson Remodeling Co.*, 253 *Ill.App.*3d 655, 191 *Ill.Dec.* 699, 702–04, 624 *N.E.*2d 887, 890–92 (1993), *appeal denied*, 155 *Ill.*2d 561, 198 *Ill.Dec.* 540, 633 *N.E.*2d 2 (1994); *see also Totz v. Continental Du Page Acura*, 236 *Ill.App.*3d 891, 177 *Ill.Dec.* 202, 211, 602 *N.E.*2d 1374, 1383 (1992). In reaching this conclusion, we point to Maria's statements to Bonnie in which she explicated Ailon's substantial needs, and Bonnie's strong assurances that such needs would be met. Viewed as a whole and taken in context, the statements respecting the reliability of Live–In Companion's employees and the quality of services to be provided could reasonably have been perceived as declarations of fact. *See R.* 4:37–2(b). The trial court erred by granting defendants' motion for a dismissal.

## III.

Viewing the evidence in a light most favorable to plaintiffs, *see Dolson v. Anastasia*, 55 *N.J.* 2, 5–6, 258 *A.*2d 706 (1969), we also find that the trial court erred by dismissing the claim for negligent hiring. An employer who negligently hires or retains in his employ an individual who is incompetent or unfit for the job "may be liable to a third party whose injury was proximately caused by the employer's" failure to exercise due care. *Di Cosala v. Kay*, 91 *N.J.* 159, 170, 450 *A.*2d 508 (1982). "The reasoning that has impelled the recognition of this cause of action ... follows from tort principles of negligence and foreseeability as well as from firmly established [rules] of agency and vicarious liability." *Ibid.* The existence of this tort is not confined within the narrow principles of *respondeat superior. Id.* at 172, 450 *A.*2d 508. The claim of negligent hiring addresses a different wrong than that

sought to be redressed by the application of principal-agent principles. *Ibid.* The tort of negligent hiring focuses instead upon the risk created by exposing members of the public to a potentially dangerous individual. *Ibid.* Thus, "the scope of employment limitation on liability which is a part of the *respondeat superior* doctrine is not implicit in the wrong of negligent hiring." *Id.* at 172–73, 450 *A.*2d 508.

It has been said that "[o]ne dealing with the public is bound to use reasonable care to select employees competent and fit for the work assigned to them and to refrain from retaining the services of an unfit employee." *Id.* at 172, 450 *A.*2d 508 (quoting *Fleming v. Bronfin,* 80 *A.*2d 915, 917 (D.C.Mun.App.1951)). "Accordingly, the negligent hiring theory has been used to impose liability in cases where the employee commits an intentional tort, an action almost invariably outside the scope of employment, against the customer ... where the employer either knew or should have known that the employee was violent or aggressive, or that the employee might engage in injurious conduct toward third persons." *Id.* at 173, 450 *A.*2d 508.

The cause of action thus has two fundamental requisites. The first involves the knowledge of the employer that the employee is dangerous or otherwise unfit for the assigned task. An employer will be held liable only where he "knew or had reason to know of the particular unfitness, incompetence or dangerous attributes of the employee and could reasonably have foreseen that such [characteristics] created a risk of harm to other persons." *Ibid.* The second requisite is that, "through the negligence of the employer in hiring the employee, the latter's incompetence, unfitness or dangerous characteristics proximately caused the injury." *Id.* at 174, 450 *A.*2d 508. Applying these principles, we conclude that plaintiff presented a *prima facie* case of negligent hiring.

A reasonable trier of fact could have concluded from the evidence that defendants failed to exercise due care in hiring Mack. Of course, "[f]oresight, not hindsight, is the standard by which one's duty of care is to be judged." *Johnson v. Usdin Louis Co.,*

248 *N.J.Super.* 525, 529, 591 *A.2d* 959 (App.Div.) (quoting *Hill v. Yaskin,* 75 *N.J.* 139, 144, 380 *A.2d* 1107 (1977)), *certif. denied,* 126 *N.J.* 386, 599 *A.2d* 163 (1991). We also acknowledge that at the time Mack was hired, his criminal record was not accessible to defendants. Although the parties have devoted much time and effort presenting their respective positions on the subject, it is reasonably clear that prior to its amendment on July 1, 1994, *see L.* 1994, *c.* 60, § 4, *N.J.S.A.* 53:1–20.6(a) authorized the Superintendent of State Police to adopt rules and regulations pertaining to "criminal history background checks," *see L.* 1985, *c.* 69, § 2, and pursuant to that authority, the Superintendent promulgated *N.J.A.C.* 13:59–1.1, *see* 17 *N.J.R.* 2282 (Sept. 16, 1985), barring non-governmental agencies from having access to such information. Although Executive Order No. 9, issued by then Governor Hughes in 1963, permitted "any person ... demonstrat[ing] a legitimate reason" to examine criminal investigation records, *N.J.A.C.* 13:59–1.1 apparently restricted access to governmental agencies. Contrary to plaintiffs' argument, Executive Order No. 123, issued by then Governor Kean in 1985, did not allow non-governmental agencies to have access to records of criminal convictions. It merely allowed the dissemination of information pertaining to a person's arrest. Piercing the maze of seemingly conflicting statutes, orders and regulations on the subject, we tend to agree with defendants' contention that records of criminal convictions were not accessible to the general public at the time of Mack's hiring.

More problematical is the question whether defendants could have obtained copies of the disorderly persons complaints of shoplifting that had been filed against Mack at the time he was hired. Rule 1:38 provides that "[a]ll records ... required by statute or rule to be made, maintained or kept on file by any court, office or official within the judicial branch of government shall be deemed a public record and shall be available for public inspection and copying...." *N.J.S.A.* 53:1–15 provides that persons arrested for shoplifting must be fingerprinted, and copies of the relevant documents, together with photographs, other required descrip-

tions, and a history of the offense must be forwarded to the State Bureau of Investigation. However, the statute does not indicate whether such information is available to the public.

Also problematical is the question whether defendants could have obtained information about Mack's drug convictions from the Division of Motor Vehicles. Mack's driver's license had been suspended because of his convictions for possession and distribution of cocaine. All records of the Division of Motor Vehicles are public records "available for examination by the citizens of New Jersey." *N.J.A.C.* 13:18–11.3(a); *see also N.J.A.C.* 13:18–11.4(b)(1). However, no evidence was presented indicating whether or not those records contain information concerning drug convictions, and, if so, whether such information was accessible to the general public at the time that Mack was hired.

Putting aside these issues, we are persuaded that a jury question was presented whether defendants made adequate inquiry into Mack's background before hiring him. Liability of an employer is not to be predicated solely upon failure to investigate the criminal history of an applicant. *See Ponticas v. K.M.S. Invs.,* 331 *N.W.*2d 907, 909 (Minn.1983). The totality of the circumstances surrounding the hiring must be considered in determining whether the employer exercised due care. *Ibid.; compare Search EDP, Inc. v. American Home Assurance Co.,* 267 *N.J.Super.* 537, 632 *A.*2d 286 (App.Div.1993), *certif. denied,* 135 *N.J.* 466, 640 *A.*2d 848 (1994), *with Sandvik, Inc. v. Statewide Sec. Sys.,* 192 *N.J.Super.* 272, 469 *A.*2d 955 (App.Div.1983), *certif. denied,* 96 *N.J.* 296, 475 *A.*2d 590 (1984). Whatever else might be said, a jury could reasonably conclude that defendants' pre-hiring investigation of Mack was deficient in light of the critical nature of the work performed by employees of Live–In Companions. It is certainly arguable that "[i]f an employer wishes to give an employee the indicia of authority to enter into the living quarters of others, it has the responsibility of first making some inquiry with respect to whether it is safe to do so." *Tallahassee Furniture Co. v. Harrison,* 583 *So.*2d 744, 751 (Fla.Dist.Ct.App.1991) (quoting

*Williams v. Feather Sound, Inc.,* 386 *So.*2d 1238, 1240 (Fla.Dist. Ct.App.1980), *review denied,* 392 *So.*2d 1374 (Fla.1981)), *review denied,* 595 *So.*2d 558 (Fla.1992). Such an argument is particularly compelling in this case because the customers of Live–In Companions were commonly helpless and ripe for abuse. In these circumstances, the trier of fact reasonably could find that the sketchy and meager application form was wholly insufficient to yield adequate information pertaining to the applicant's background, criminal history and experience. The jury also could reasonably find that a proper investigation would have disclosed Mack's propensity to violate the law and his general lack of fitness to perform the considerable responsibilities required of Live–In Companion's employees. We conclude that a jury question was presented and that the trial court erred by dismissing plaintiffs' claim.

### IV.

As we noted earlier, the trial court dismissed all of Ailon's claims. We agree that Ailon was not the direct victim of the consumer fraud. The misrepresentations were made to Maria to induce her to enter the agreement with defendants. However, Maria arguably was acting as Ailon's agent. Although Maria entered into the contract with defendants, Ailon was the party who was actually injured by the alleged fraud. We thus reinstate Ailon's claim for consumer fraud.

We also reinstate Ailon's claim for negligent hiring. Maria retained the services of Live–In Companions. However, defendants' alleged negligence proximately caused harm to Ailon who was the focus of the care-providing agreement. We believe that defendants' duty of care was owed to both Maria and Ailon. Whether a duty exists "is ultimately a question of fairness." *Goldberg v. Housing Auth. of Newark,* 38 *N.J.* 578, 583, 186 *A.*2d 291 (1962). "When the court determines that a duty exists and liability will be extended, it draws judicial lines based on fairness and policy." *Kelly v. Gwinnell,* 96 *N.J.* 538, 544, 476 *A.*2d 1219

(1984). "Negligence is tested by whether the reasonably prudent person at the time and place should recognize and foresee an unreasonable risk or likelihood of harm or danger to others." *Rappaport v. Nichols*, 31 *N.J.* 188, 201, 156 *A.2d* 1 (1959). A tortfeasor is generally held answerable for the injuries which result in the course of events from his negligence. *Id.* at 203, 156 *A.2d* 1. We perceive no sound basis for excepting Ailon's claim from that general principle.

We are sensitive to the potential for duplicative recovery of damages. However, we are satisfied that carefully crafted jury instructions can obviate that danger. We thus reverse the trial court's involuntary dismissal of Ailon's claims for consumer fraud and negligent hiring.

## V.

■ We reject plaintiffs' remaining arguments. Initially, we find no merit in plaintiffs' claim that the trial court erred when it granted summary judgment dismissing their cause of action for negligent and intentional infliction of emotional distress. Negligent infliction of emotional distress consists of "negligent conduct that is the proximate cause of emotional distress in a person to whom the actor owes a legal duty to exercise reasonable care." *Decker v. Princeton Packet, Inc.*, 116 *N.J.* 418, 429, 561 *A.2d* 1122 (1989). Intentional infliction of emotional distress consists of "extreme and outrageous conduct [which] intentionally or recklessly causes severe emotional distress to another." *Buckley v. Trenton Sav. Fund Soc'y*, 111 *N.J.* 355, 366, 544 *A.2d* 857 (1988) (quoting *Restatement (Second) of Torts* § 46 (1965)). Our Supreme Court has said that "[t]he severity of the emotional distress raises questions of both law and fact," and that the trial judge "decides whether as a matter of law such emotional distress can be found, and the jury decides whether it has in fact been proved." *Id.* at 367, 544 *A.2d* 857; *accord Decker v. Princeton Packet, Inc.*, 116 *N.J.* at 430, 561 *A.2d* 1122.

We agree with the trial court that plaintiffs did not show the severity of emotional harm required to underpin a cognizable claim. *See Trisuzzi v. Tabatchnik,* 285 *N.J.Super.* 15, 26, 666 *A.*2d 543 (App.Div.1995). While both plaintiffs were "acutely upset" by reason of the incident, their emotional distress was not "sufficiently substantial to result in physical illness or serious psychological sequelae." *Eyrich v. Dam,* 193 *N.J.Super.* 244, 253, 473 *A.*2d 539 (App.Div.), *certif. denied,* 97 *N.J.* 583, 483 *A.*2d 127 (1984); *see also Gautam v. De Luca,* 215 *N.J.Super.* 388, 399, 521 *A.*2d 1343 (App.Div.), *certif. denied,* 109 *N.J.* 39, 532 *A.*2d 1107 (1987). We add for the sake of completeness that the conclusions reached by plaintiffs' expert were properly excluded as "net opinions." *See Saunderlin v. E.I. DuPont Co.,* 102 *N.J.* 402, 416–17, 508 *A.*2d 1095 (1986). The witness's bare conclusions were wholly unsupported by factual evidence. *Buckelew v. Grossbard,* 87 *N.J.* 512, 524, 435 *A.*2d 1150 (1981); *Dawson v. Bunker Hill Plaza Assocs.,* 289 *N.J.Super.* 309, 323–25, 673 *A.*2d 847 (App. Div.), *certif. denied,* 146 *N.J.* 569, 683 *A.*2d 1164 (1996); *Jimenez v. GNOC, Corp.,* 286 *N.J.Super.* 533, 540–43, 670 *A.*2d 24 (App. Div.), *certif. denied,* 145 *N.J.* 374, 678 *A.*2d 714 (1996).

We also find no error in the trial court's dismissal of plaintiffs' claim for invasion of privacy. "[O]ne who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of privacy, if the intrusion would be highly offensive to a reasonable person." *Figured v. Paralegal Technical Servs., Inc.,* 231 *N.J.Super.* 251, 256, 555 *A.*2d 663 (App.Div.1989) (quoting *Restatement (Second) of Torts* § 652B (1977)), *appeal dismissed,* 121 *N.J.* 666, 583 *A.*2d 350 (1990). Here, plaintiffs invited Mack into their home. No evidence was presented supporting the claim of an unlawful intrusion.

Equally without merit is plaintiffs' argument that the trial court erred by dismissing their claim for conversion. Mack's theft of plaintiffs' property was not within the scope of his employment. In any event, the loss associated with Mack's unlawful taking

constitutes one of the elements of damages included in plaintiffs' claim for negligent hiring.

We also reject plaintiffs' contention that the trial court erroneously dismissed their claim for breach of contract. Our examination of the record discloses that plaintiffs acquiesced in the dismissal of their contract claim. We thus decline to consider the issue. *Nieder v. Royal Indem. Ins. Co.*, 62 *N.J.* 229, 234, 300 *A.*2d 142 (1973).

We are entirely unpersuaded by plaintiffs' argument that Joseph Oechsle was improperly dismissed as a defendant. Joseph was neither a founder, director, president nor moving force of Live–In Companions. He was named vice-president, secretary and treasurer of the corporation "on paper" when the business was incorporated, but he remained largely inactive. Moreover, no evidence was presented indicating that Joseph took part in any of the activities leading to the hiring or assignment of Mack. There was absolutely no basis to hold Joseph liable for either negligent hiring or consumer fraud. The trial court was correct in dismissing the claims against him.

Finally, we conclude that the trial court was correct in dismissing plaintiffs' claim for punitive damages. "To warrant a punitive award, the defendant's conduct must have been wantonly reckless or malicious." *Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 97 *N.J.* 37, 49, 477 *A.*2d 1224 (1984). As phrased by our Supreme Court, "[t]here must be an intentional wrongdoing in the sense of an 'evil-minded act' or an act accompanied by wanton and willful disregard of the rights of another." *Ibid.* Although defendants might have been negligent in hiring Mack, there is no evidence that their conduct was reckless. *See, e.g., Enright v. Lubow*, 202 *N.J.Super.* 58, 76, 493 *A.*2d 1288 (App.Div.1985), *certif. denied*, 104 *N.J.* 376, 517 *A.*2d 386 (1986), *reconsidered and aff'd*, 215 *N.J.Super.* 306, 521 *A.*2d 1300 (App.Div.), *certif. denied*, 108 *N.J.* 193, 528 *A.*2d 19 (1987). Nor was there any evidence that defendants' alleged misrepresentations were made with malice or

in a reckless fashion. We discern no basis to disturb the trial court's decision.

The judgment of the Law Division is affirmed in part and reversed in part. The matter is remanded for a new trial.