**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3434-23

SHORE STAR PROPERTIES,
LLC,

     Plaintiff-Appellant,

v.

KOLBE & KOLBE MILLWORK
CO., INC.,

     Defendant-Respondent,

and

NORTH AMERICAN WINDOW
& DOOR CO., INC.,

     Defendant.

_____

Argued September 9, 2025 – Decided September 22, 2025

Before Judges Gilson, Firko, and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Cape May County, Docket No. L-0125-20.

Katrina M. Register argued the cause for appellant (Trimble & Register, attorneys; Katrina M. Register and John W. Trimble, Jr., on the briefs).

Francis X. Donnelly argued the cause for respondent (Donnelly, Petrycki & Sansone, PC, attorneys; Francis X. Donnelly, on the brief).

PER CURIAM

Plaintiff Shore Star Properties, LLC (Shore Star) appeals from a May 31, 2024 order granting summary judgment in favor of defendant Kolbe & Kolbe Millwork Co., Inc. (Kolbe). Having considered the record and applicable principles of law, we affirm.

## I.

This case arises out of the sale of custom-made windows and doors manufactured by Kolbe and sold through a distributor, defendant North American Window & Door Co., Inc. (NAWD),[1] to Correlation Real Estate Venture, LLC. (CREV). The Kolbe windows and doors were installed in a new home owned by Shore Star in Avalon (the Project). Robert Corrato is the sole member of CREV and Shore Star. Christopher D'Angelo was Shore Star's representative on the Project.

---

[1] Plaintiff's claims against NAWD were previously settled and dismissed. NAWD is not participating in this appeal.

In October 2014, Corrato, on behalf of Shore Star, met with NAWD to review Kolbe's products. Corrato discussed with NAWD "negative comments about Kolbe products in [a shore] environment." NAWD assured Corrato "Kolbe['s] products were re-designed, . . . would be functional and defect[ ]free in [a shore] environment[,] and were . . . quality product[s]." Corrato also reviewed materials in which Kolbe advertised its products as being "high[-] end windows and doors" made with the "finest materials" and "crafted with attention to detail and thoughtful engineering . . . ." Kolbe advertised its "products are rigorously tested to exceed industry standards for energy[,] efficiency[,] and performance" and it focuses "on the details, crafting one window or door at a time, precisely to your specifications."

On March 3, 2015, CREV purchased sixty-four Kolbe windows and eight Kolbe doors from NAWD. The windows and doors were delivered to CREV in November 2015, subject to an Express Limited Warranty for Window and Door Products (the warranty) that provides, in relevant part:

> Kolbe . . . warrants that, if installed, finished, maintained[,] and operated in accordance with Kolbe's instructions, non-vinyl WINDOW and DOOR products manufactured by Kolbe . . . shall be free from defects in material and workmanship that would render them unserviceable or unfit for the ordinary use for which each window or door is manufactured, for a period of TEN . . . YEARS from the date of shipment by Kolbe.

A-3434-23

. . . .

In the event of a defect in material or workmanship, which is covered by this [e]xpress [l]imited [w]arranty, Kolbe reserves the right, at its option, to determine the best method needed to correct the situation as follows: (1) provide part/product to repair or replace any window/door in whatever stage of fitting and/or finishing it was in when originally supplied by Kolbe (all replacement parts will be pursuant to the standards and/or specifications in effect at the time of claim and not at the time of original manufacture), or (2) refund the price received by Kolbe for any window/door.

. . . .

THIS EXPRESS LIMITED WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED. THERE ARE NO IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PUPOSE, OR ANY OTHER WARRANTIES THAT EXTEND BEYOND THE EXPRESS LIMITED WARRANTY. . . . THE REMEDIES PROVIDED UNDER THIS EXPRESS LIMITED WARRANTY ARE EXCLUSIVE AND IN LIEU OF ALL OTHER REMEDIES AT LAW OR EQUITY.

CREV retained Stonewood Builders (Stonewood) to install the Kolbe windows and doors. James Card is the owner of Stonewood. The windows and doors were installed by the end of December 2015.

In January and February 2016, Shore Star communicated with NAWD "regarding trivial defects," including problems with retractable screens,

"internal latches installed backwards[,]" and "weather stripping . . . cut too short." Kolbe corrected the defects.

In June 2016, a painting contractor began priming the interior wood of the windows, including the window sashes. The painter observed what he believed was water "coming out from behind the aluminum that the wood was attached to" on seven window sashes. Card took videos of the sashes and notified D'Angelo who, in turn, reported the condition to NAWD. In response, Kolbe manufactured seven new window sashes, which NAWD delivered to the Project. Shore Star also identified three Kolbe doors that appeared to have some separation of the seams of the aluminum cladding. In response, NAWD offered to provide CREV with three new doors. Shore Star never observed water infiltrating through the windows or doors into the interior of the Project.

Shore Star rejected NAWD's offer to replace the three doors and never installed most of the seven replacement sashes that were delivered. According to Corrato, "Kolbe did not correct the defects and mistakes but rather sent some replacement sashes with the same defects." Corrato also testified at his deposition:

> [Counsel]. [G]enerally speaking, did you know whether it could have been a very minor repair to seal up a seam in the aluminum cladding?

[Coratto]. Yeah. I . . . do recall some conversation about placing a bead of caulk. And my response to that was, [a]re we going to have to caulk this window every year? Is this what a quality product involves? So[,] I specifically remember some conversation to that end. It's like, [y]eah, you can put some caulk in here. And I[ am] like … that[ is] not a solution that[ is] a long-lasting solution. And nowhere in the documentation did I recall reading that you would have to caulk your windows every year.

[Counsel]. Did somebody tell you -- whoever talked to you about a piece of caulk, that was respect to the window sashes or the doors?

[Corrato]. I do[ not] remember the specifics in terms of windows or doors. I believe it was in reference to the windows, but I can[not] be certain, but that was my conversation with . . . D'Angelo.

[Counsel]. And in those conversations, is it your recollection that … D'Angelo or you were told that you would have to caulk . . . those seams in the aluminum cladding on an annual basis?

[Corrato]. Maybe that[ was] my assumption, but I have[ not] seen any caulk that lasts for more than a year down the shore.

According to D'Angelo, however, "whenever [Shore Star] raised an issue with a sash or a door or whatever, it was always the same answer, which was to provide a replacement component. But [in Shore Star's] experience . . . replacing [those] components was starting to look like an ongoing maintenance issue."

6

A-3434-23

D'Angelo testified Kolbe "was not provided with the opportunity to repair or replace those three doors or any of the other windows in the house with the exception of the seven sashes" because Shore Star "[was not] going to replace substandard materials with substandard materials."  At the time Shore Star made that decision "the only issues [D'Angelo was] aware of . . . involved the seven sashes that had been replaced, retractable screens that had been fixed[,] and three third floor doors that Kolbe had offered to replace."

Shore Star contends its "experience was such that [it] ultimately determined that using the Kolbe products in the [Project] would result in a constant and perpetual series of component failures and replacements."  As a result, Shore Star decided to replace the Kolbe products with windows and doors manufactured by Anderson Windows (Anderson).

D'Angelo instructed Stonewood to obtain a quote for replacement windows and doors, which Stonewood received on August 2, 2016.  On August 16, CREV obtained a proposal from O.C.F. Construction, LLC (O.C.F. Construction) to replace the windows and doors.  On August 17, Shore Star's professional engineering expert, Marur Dev of Dev Engineering, LLC, inspected the Kolbe products as installed.  According to Dev, "[a]t that time, based on the presence of water in the sashes and the unacceptable recommendation to caulk

7

all windows, [Shore Star] decided to remove all the Kolbe products to mitigate the expense of having to remove the products post-completion of construction." Dev conducted a subsequent site inspection on October 12, and returned on December 1 and January 9, 2017, to inspect the removal and inspection of certain windows on the third floor of the home.

On November 1, 2016, counsel for Shore Star, John W. Trimble, Jr., Esq., wrote to Kolbe's general counsel, Shannon Berens, Esq., that Shore Star was "giving [it] the opportunity to inspect [the] windows currently installed at" the Project. Trimble advised Berens "if [he] did not hear from [her] by November 14, 2016, it [wa]s [Shore Star's] intent to remove said windows from the property."

On November 14, Trimble wrote to Berens "the windows at the property have been inspected by an engineer" who noted "[m]oisture has seeped in and/or condensed behind the cladding and sash frame after the installation of the window." "The moisture . . . is [a] result of the following conditions, singularly or in combination: 1. [c]ondensation of air trapped between the cladding and wood frame of the sash at the time of high humidity in summer time[;] 2. [a]ctual water leak at the seam between the glazing and aluminum cladding." Trimble also asserted "[e]vidence of movement in the vertical sash frames due to thermal

expansion and contraction was observed" and "is contributing to breach in the seams of the aluminum clad."

Trimble stated "[a] more comprehensive expert report detailing all defects with specificity will be supplied in the future." He advised Berens, Shore Star "is removing and replacing the Kolbe windows with Anderson Windows . . . scheduled to be delivered on November 22, 2016." In response, Berens requested a copy of Shore Star's engineering report. On November 15, Trimble responded that Shore Star would "not be supplying any engineering report . . . at this time."

On December 2, 2016, D'Angelo returned the executed August 16, 2016 proposal to O.C.F. Construction. In January 2017, the Kolbe products were removed and placed in storage. In August 2019, they were transported to Stonewood where they were subjected to destructive testing or "autopsy" by Shore Star's fenestration expert, Matthew Roetter of Roetter Window and Door Company, Inc. Roetter sent wood samples to a laboratory to determine if the wood was properly treated with wood preservative. The laboratory results were reviewed by Shore Star's wood preservative expert, Glenn M. Larkin of LarChem LLC.

9

On April 14, 2020, Shore Star filed its complaint in this action against Kolbe and NAWD, asserting causes of action against Kolbe alleging: (1) violations of the New Jersey Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -228; (2) breach of implied warranty; (3) negligent misrepresentation; (4) negligence; and (5) common law fraud.[2]

Shore Star specifically alleged:

> 36. In June 2016, [it] discovered evidence that rainwater exited from the aluminum clad and sashes.
>
> 37. In June 2016, Kolbe was notified that its windows and doors were defective and notified of the rainwater exiting from the aluminum clad and sashes.
>
> 38. After inspection in or about July 2016 by . . . Kolbe [and NAWD] representatives, the representatives recommended that the leaking sashes be replaced.
>
> 39. Despite the evident defects, Kolbe has refused to replace the windows and doors at [Shore Star's] property.

In an expert report dated May 12, 2023, Roetter opined "[w]ater infiltration into [Shore Star's] sash[es] was caused by manufacturing defects."

---

[2] Shore Star asserted a cause of action for breach of contract solely against NAWD. It did not assert a breach of contract claim against Kolbe. In addition, at oral argument Shore Star stated it was not appealing the dismissal of its causes of action for negligence, negligent misrepresentation, and common law fraud.

A-3434-23

The manufacturing defects [he] observed in the autopsied windows and doors contained improper application of glazing sealants, mortise and tenon gaps, gaps in the sash weather stripping, gaps in the clad door panel interface with stash stile and rail, lack of sealant in the sash stile and rail interface. The above defects caused rainwater infiltration into the sash[es].

Roetter's "autopsy of . . . [the] windows did not reveal any properly glued mortise and tenon joints. Every mortise and tenon joint [he] opened either had no glue or a small amount of glue on the tenon which is considered a weakened . . . joint." As a result, he opined the products failed to meet Kolbe's Construction Specifications Institute (CSI) specifications and engineering drawings that provided all mortise and tenon joints would be glued.

Roetter explained the Window and Door Manufacturer's Association (WDMA) Hallmark Certification Program "is a third-party certification program that manufacturers and suppliers of windows, doors, and skylights voluntarily participate in for added credibility." "The [p]rogram consists of a series of plant inspections and testing by third parties to demonstrate that the products are manufactured in the same manner as the prototype product tested." "Once manufacturers demonstrate compliance with all applicable standards and building codes, they are permitted to use trademarked WDMA Hallmark Certification labels on [their] products."

11

According to Roetter, as determined by Larkin in his expert report dated May 12, 2023, the Kolbe products tested "did not meet the [wood preservative] retention specifications . . . WDMA Hallmark Certification requires. . . . Therefore, the millwork did not comply with the requirements of WDMA Hallmark Certification." In addition, as determined by Larkin, the millwork was not "sufficiently treated with [an adequate concentration of wood preservative] to provide long-term protection against wood decay fungi."

Roetter also opined, "the windows and doors sold to [Shore Star] should not have been identified as WDMA Hallmark certified" because they "were not manufactured as the windows and doors that were identified in the CSI specifications, Kolbe engineering drawings[,] and those identified by Kolbe to have been tested by third[ ]parties for quality and performance."

In an expert report also dated May 12, 2023, Dev opined, based on his site inspections and review of the autopsied windows and doors, the Kolbe products did not comply with minimum applicable standards and Kolbe's own manufacturing specifications. He determined

> The water leak [he] observed from a window sash in a video recording by . . . Card . . . was caused by . . . improper application of glazing sealant . . . during the manufacturing process . . . [,]failure of Kolbe to install plastic spacer in some window sashes during the manufacturing

process . . . [,]improper application of glue pursuant to CSI [specifications] . . . [,][and] non-compliant/substandard application of wood glue by Kolbe at the mortise and tenon joints . . . during the manufacturing process.

Dev also opined "the following material defects were observed in the window sashes . . . [i]nsufficient application of wood preservative . . . [and] [r]usting of fasteners in the mortise and tenon joints due to water intrusion."

II.

After the close of discovery, Kolbe moved for summary judgment. On March 19, 2024, the court heard oral argument. On May 31, 2024, the court entered an order granting Kolbe's motion supported by a written opinion.

The court determined Shore Star's breach of implied warranty claim is precluded because Kolbe's warranty provides it is "exclusive and in lieu of all other remedies at law or equity." It rejected Shore Star's claim the exclusive remedy failed in its essential purpose because Shore Star did not give Kolbe the opportunity to fulfill its obligations under the warranty. The court rejected Shore Star's claim it had the right to revoke acceptance of the goods under the New Jersey Uniform Commercial Code (UCC), N.J.S.A. 12A:2-608, because the warranty provides it is Shore Star's exclusive remedy.

13

The court dismissed Shore Star's CFA claim because it failed to establish Kolbe made material misrepresentations of fact that caused its alleged loss. The court found Kolbe's statement that it "craft[s] one window or door at a time" could not reasonably be understood to mean "Kolbe makes one window from scratch, finishes that window, and only then moves on to building another window. Alternatively, no reasonable person could believe that phrase means that one Kolbe employee builds one entire window, and then upon completion moves on to build another window." The court found this statement was nothing more than "sales talk or puffery," which "cannot be the basis for a consumer fraud claim." The court rejected Shore Star's claims based on Kolbe's marketing statements that its products are "high[-]end windows and doors" made with the "finest materials" and "crafted with attention to detail and thoughtful engineering" for the same reasons.

The court determined Shore Star's remaining misrepresentation allegations are nothing more than claims of manufacturing defects. For example, the court reasoned Shore Star's claim Kolbe misrepresented its products are WDMA Hallmark certified "is based primarily on a finding by [its] lab and expert that wood preservative was not present at a sufficient depth . . . This is not a misrepresentation. Even if Shore Star's expert is correct[]

14

that the product did not meet the design criteria, that is not an unconscionable act. It is a manufacturing defect. . . . Typically, a manufacturing defect cannot be the basis for a" CFA claim.

The court rejected Shore Star's claim Kolbe violated the CFA by concealing the alleged manufacturing defects with aluminum cladding. "Aluminum cladding was a feature of the product ordered by Shore Star; it was not put on the windows with the purpose of concealing any defect" and "there is not any evidence that Kolbe intentionally hid any known defects." This appeal followed.

III.

On appeal, Shore Star contends the court erred in dismissing its CFA claim. It contends "Kolbe made misrepresentations of fact regarding the quality and specifications of the windows and doors sold to [Shore Star]." Specifically, it argues Kolbe does not "craft one door at a time" as advertised, "but rather uses an assembly line manufacturing process . . . where there are 700 to 900 employees on the manufacturing floor."

It also argues Kolbe made "misrepresentations about being a member of the WDMA and products meeting heightened manufacturing standard" because "forensic testing revealed Kolbe's products did not meet" the "WDMA [i]ndustry

A-3434-23

[s]tandard for [w]ood [p]reservative [t]reatment." Rather, "the tested products are prototypes. . . . None of [Shore Star's] windows and doors were tested by Kolbe, and therefore, no actual products sold to customers are tested."

Shore Star additionally claims: (1) NAWD misrepresented to Corrato "the Kolbe products were re-designed, would be functional and defect-free in the shore environment, and were quality products;" (2) Kolbe's advertising misrepresented it "submits its windows and doors to independent organizations which test them to rigorous protocols," its products are "high[-]end windows and doors" made with the "finest materials" "crafted with attention to detail and thoughtful engineering;" and (3) Kolbe misrepresented its "aluminum clad windows . . . were water-tight, and not windows that hold water."

Shore Star argues it "did not receive the Kolbe products it intended to purchase" because "the actual products provided did not meet the applicable specifications and WDMA Hallmark Certification requirements as represented and advertised." "Kolbe's act of providing [Shore Star] with an entirely different product than what was represented . . . constitutes a violation of the CFA."

A-3434-23

Finally, Shore Star contends Kolbe violated the CFA by concealing the alleged defects by applying aluminum cladding.[3]

Shore Star contends the court improperly dismissed its implied warranty claim because the exclusive remedy afforded by the express warranty failed in its essential purpose and it had the right to revoke acceptance of the goods pursuant to N.J.S.A. 12A:2-608(1).  It argues "questions of fact exist whether [Shore Star] provided Kolbe with an opportunity to repair or replace the defective windows and doors."

IV.

We affirm substantially for the reasons set forth in the trial court's thorough and well-reasoned opinion.  We add the following comments.

Our review of a trial court's grant or denial of a motion for summary judgment is de novo.  Samolyk v. Berthe, 251 N.J. 73, 78 (2022).  Like the trial court, we consider "whether the competent evidential materials presented, when

---

[3] In its reply brief and oral argument, Shore Star also argued Kolbe violated the CFA because "four of the Kolbe doors . . . were not tested by a third party . . . and had no design pressure ("DP") rating."  This legal argument was not presented in Shore Star's initial brief, and we decline to consider arguments raised for the first time in a reply brief or at oral argument. See Alpert, Goldberg, Butler, Norton & Weiss, P.C. v. Quinn, 410 N.J. Super. 510, 527 n.5 (App. Div. 2009); see also Bouie v. N.J. Dep't of Cmty. Affairs, 407 N.J. Super. 518, 525 n.1 (App. Div. 2009).

viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995). Our review of a trial court's interpretation of the law is also de novo. See Finderne Mgmt. Co., Inc. v. Barrett, 402 N.J. Super. 546, 573 (App. Div. 2008).

Rule 4:46-2(c) provides a motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." "By its plain language, R. 4:46-2 dictates that a court should deny a summary judgment motion only where a party opposing the motion has come forward with evidence that creates a 'genuine issue as to any material fact challenged.'" Brill, 142 N.J. at 529. Insubstantial arguments based on assumptions or speculation are not enough to overcome summary judgment. Ibid. Likewise, "'conclusory and self-serving assertions . . . are insufficient to overcome' a motion for summary judgment." Dickson v. Cmty. Bus Lines, Inc., 458 N.J. Super. 522, 533 (App. Div. 2019) (quoting Puder v. Buechel, 183 N.J. 428, 440-41 (2005)).

A.

The court correctly granted summary judgment dismissing Shore Star's CFA claim. The CFA provides, in relevant part,

> [t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate … whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice . . . .
>
> [N.J.S.A. 56:8-2.]

"The CFA requires a plaintiff to prove three elements: '[(]1) unlawful conduct by [the] defendant; [(]2) an ascertainable loss by [the] plaintiff; and [(]3) a causal relationship between the unlawful conduct and the ascertainable loss.'" D'Agostino v. Maldonado, 216 N.J. 168, 184 (2013) (quoting Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 557 (2009)).

Violations of the CFA may be established through: (1) an affirmative misrepresentation by the defendant; (2) the defendant's knowing and intentional omission or failure to disclose a material fact; or (3) "violations of specific regulations promulgated under the [CFA]." Monogram Credit Card Bank of Ga. v. Tennesen, 390 N.J. Super. 123, 133 (App. Div. 2007) (quoting Cox v. Sears

Roebuck & Co., 138 N.J. 2, 18 (1994)).  The purpose of the CFA is "to prevent deception, fraud or falsity, whether by acts of commission or omission, in connection with the sale and advertisement of merchandise and real estate." Fenwick v. Kay Am. Jeep, Inc., 72 N.J. 372, 376-77 (1977); see also New Mea Constr. Corp. v. Harper, 203 N.J. Super. 486, 500 (App. Div. 1985).

"[A]n affirmative misrepresentation is 'one which is material to the transaction and which is a statement of fact, found to be false, made to induce the buyer to make the purchase.'"  Mango v. Pierce-Coombs, 370 N.J. Super. 239, 251 (App. Div. 2004) (quoting Ji v. Palmer, 333 N.J. Super. 451, 462 (App. Div. 2000)).

A statement is material if:

> (a) a reasonable person would attach importance to its existence in determining a choice of action . . . ; or (b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable [person] would not so regard it.
>
> [Palmer, 333 N.J. Super. at 462 (quoting Restatement (Second) of Torts § 538(2) (Am. Law Inst. 1977)).]

Courts have recognized "a distinction between misrepresentations of fact actionable under the CFA and mere puffing about a product or a company that will not support relief."  N.J. Citizen Action v. Schering-Plough Corp., 367 N.J.

20

Super. 8, 13 (App. Div. 2003). "Exaggerated claims of quality" are considered mere "puffery." Lingar v. Live-in-Companions, Inc., 300 N.J. Super. 22, 28 (App. Div. 1997). "It is the capacity to mislead that is the 'prime ingredient of all types of consumer fraud' under the CFA." Suarez v. E. Intern. Coll., 428 N.J. Super. 10, 32 (App. Div. 2012) (quoting Cox, 138 N.J. at 16-17).

We are satisfied the court properly determined Kolbe's advertising statements that its products are "high[-]end windows and doors" made with the "finest materials" and "crafted with attention to detail and thoughtful engineering," and that its products are "water-tight" are nothing more than puffery or exaggerated claims of product quality that will not support relief under the CFA. These types of general advertising claims do not represent misrepresentations of any material fact with the capacity to mislead a consumer.

Likewise, the court correctly determined Kolbe's statement that it "craft[s] one door at a time" is a form of advertising puffery meant to convey Kolbe's products are built to the customer's specifications. As the court recognized, "no reasonable person could believe that phrase means . . . one Kolbe employee builds one entire window, and then upon completion moves on to build another window."

A-3434-23

Shore Star's claim NAWD misrepresented to Corrato "the Kolbe products were re-designed . . . would be functional and defect-free in the shore environment, and were . . . quality product[s]" fails for the same reasons. Moreover, Shore Star does not point to any evidence establishing NAWD's representations were false.

Shore Star's claim Kolbe misrepresented it sends every window and door it produces for testing finds no support in the record. Rather, Kolbe advertises "product samples and components are tested periodically by third[-]party testing laboratories." Consistent with this claim, Shore Star's expert, Roetter, noted in his report the WDMA Hallmark Certification program "consists of a series of plant inspections and testing by third parties to demonstrate that the products are manufactured in the same manner as the prototype product tested." Kolbe did not misrepresent that it sends every one of its products to independent organizations for testing.

The court appropriately found Shore Star's claim Kolbe misrepresented its products are WDMA Hallmark Certified because "forensic testing revealed Kolbe's products did not meet" the "WDMA [i]ndustry [s]tandard for [w]ood [p]reservative [t]reatment" represents an allegation of manufacturing defect, not a misrepresentation. In fact, Shore Star, does not and cannot allege Kolbe

22

falsely states it is a member of WDMA or that prototypes of its products are tested by WDMA. Rather, it contends the products it received fell short of the WDMA Hallmark Certification requirements as a result of alleged manufacturing defects. Kolbe did not misrepresent that its products are WDMA Hallmark Certified.

Shore Star's reliance on New Mea is not persuasive. In New Mea, a contractor entered into a "contract to build a one-family residence . . . in accordance with the plans." 203 N.J. Super. at 498. The property owner alleged "ungraded Hem-Fir (hemlock) was used in the framing, contrary to the specifications which called for Graded #1 Douglas Fir." Ibid. The trial court found the contractor "attempted to shortchange the property owner by substituting cheaper materials" and "the blatant substitution of substandard lumber for framing [was] abominable." Id. at 501. "Against the backdrop of these findings" we concluded "the [CFA] is applicable to a custom builder who uses substandard material." Ibid.

Unlike the contractor in New Mea, Shore Star does not point to any evidence Kolbe substituted cheaper materials or that Kolbe delivered products other than those Shore Star ordered. Rather, Shore Star alleges certain manufacturing defects existed in the Kolbe products it received. The existence

of manufacturing defects, without more, is not a basis to find a violation of the CFA.

We are unconvinced by Shore Star's claim Kolbe intentionally concealed known manufacturing defects. As the court aptly noted, "[a]luminum cladding was a feature of the product ordered by Shore Star; it was not put on the windows with the purpose of concealing any defect" and "there is not any evidence that Kolbe intentionally hid any known defects." Therefore, we conclude summary judgment was properly granted.

B.

The court also properly dismissed Shore Star's claim for breach of implied warranty. "[P]arties to a contract may establish an exclusive remedy, which, if so labeled, 'is the sole remedy' available to them under the terms of the contract." BOC Grp., Inc. v. Chevron Chem. Co., LLC, 359 N.J. Super. 135, 146 (App. Div. 2003) (citing N.J.S.A. 12A:2-719(1)(b)). The "complete exclusion of implied warranties . . . is specifically permitted under the [UCC]." Gladden v. Cadillac Motor Car, 83 N.J. 320, 330-31 (1980).

Here, there is no reasonable dispute the warranty establishes an exclusive remedy and completely excludes any implied warranties. Shore Star does not contend otherwise. Rather, Shore Star argues it should not be bound by the

24

exclusive remedy provided in the warranty because the warranty failed in its essential purpose or, at a minimum, there exist material questions of fact precluding summary judgment on that claim. The record does not support that argument.

When a breach of warranty provision limits a seller's obligation to repair or replace defective equipment, "before the exclusive remedy is considered to have failed in its essential purpose, the seller must be given an opportunity to repair or replace the product." BOC Grp., Inc., 359 N.J. Super. at 147. A remedy may fail in its essential purpose if the product does not operate free of defects after several attempts to repair, "or repair or replacement take an unreasonable time to complete." Id. at 148. "In other words, the exclusive remedy of repair and replacement . . . fails of its essential purpose if, after numerous attempts to repair, the [product does] not operate as a new [product] should[,] free of defects." Gen. Motors Acceptance Corp. v. Jankowitz, 216 N.J. Super. 313, 329 (App. Div. 1987). "Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in [the UCC]." N.J.S.A. 12A:2-719(2).

Shore Star's contention it permitted Kolbe an opportunity to repair or replace the windows and doors is not supported by competent evidential

materials in the record. The record establishes Kolbe manufactured and delivered new sashes to replace the seven sashes that were identified by Shore Star as allegedly defective, and, through NAWD, offered to replace the three doors Shore Star contended were defective. Kolbe was not given the opportunity to repair or replace any other windows and doors, nor was it given the opportunity to address the defects alleged in plaintiff's expert reports that were first identified to Kolbe years after the products were removed.

Instead, no later than August 2, 2016, Shore Star obtained a quote from Anderson for replacement windows, and no later than August 16, obtained a quote from O.C.F. Construction to remove the Kolbe products and replace them. By the time Dev arrived for his inspection on August 17, Shore Star already decided to "remove all the Kolbe products." On November 1, Trimble wrote to Berens it was Shore Star's "intent to remove said windows from the property." On November 14, Trimble advised Berens the replacement windows were scheduled for delivery on November 22. We are satisfied the court correctly determined Shore Star failed to give Kolbe a reasonable opportunity to repair or replace any allegedly defective windows and doors other than the seven windows and three doors Kolbe agreed to replace.

26

Shore Star's contention Kolbe refused to honor its warranty and instead advised Shore Star to seal any leaks with "a bead of caulk" is not supported by competent evidence in the record. In fact, it is contradicted by D'Angelo's testimony and undisputed facts.

Shore Star's claim is based solely on Corrato's testimony that he "recalled some conversation . . . with D'Angelo" about "placing a bead of caulk." It was "some conversation to that end. It[ is] like, [y]eah you can put some caulk in here." Based on that, it was Corrato's "assumption" D'Angelo was told by someone they would need to caulk the seams on an annual basis. There is no evidence in the record to support Shore Star's claim other than Corrato's "assumption" based on his conversation with D'Angelo.

D'Angelo's testimony, however, directly contradicts Corrato's claim. He testified "whenever [Shore Star] raised an issue with a sash or a door[ . . . ]it was always the same answer, which was to provide a replacement component." In fact, the undisputed evidence in the record establishes Kolbe repaired, replaced, or offered to replace, every defective window and door Shore Star identified before Shore Star removed the Kolbe products.

Based upon our de novo review, the court properly determined Shore Star failed to give Kolbe a reasonable opportunity to honor its obligations under the

warranty. Kolbe was never given the opportunity to remedy the alleged defects, including the defects alleged in Shore Star's expert reports, in accordance with its obligations under the warranty. Therefore, Shore Star's claim the warranty failed in its essential purpose lacks merit.

Because the warranty did not fail in its essential purpose, Shore Star's claim that it had the right to revoke acceptance of the goods pursuant to N.J.S.A. 12A:2-608(1) is incorrect. "Although revocation of acceptance is available to the purchaser of a defective product pursuant to N.J.S.A. 12A:2-608, that right does not accrue where . . . the product is sold with a limitation of remedy." Palmucci v. Brunswick Corp., 311 N.J. Super. 607, 612 (App. Div. 1988).

To the extent we have not specifically addressed any remaining arguments, it is because they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-3434-23